**UNITED STATES of America**

v.

**Jeffrey E. TRUMAN, Sr., Defendant.**

**No. 5:10–CR–245.**

United States District Court,
N.D. New York.

Feb. 1, 2011.

---

Richard S. Hartunian, United States Attorney, Edward R. Broton, Esq., Gwendolyn E. Carroll, Esq., Asst. United States Attorneys, Syracuse, NY.

Edward Z. Menkin, Esq., Syracuse, NY, for Defendant.

*MEMORANDUM–DECISION and ORDER*

DAVID N. HURD, District Judge.

### TABLE OF CONTENTS

INTRODUCTION .................................................442

BACKGROUND ..................................................443

RULE 29 JUDGMENT OF ACQUITTAL .........................................444
 Standard......................................................444
 Analysis—Rule 29(a) .........................................445
 Count 1—Aiding and Abetting Arson ......................445
 Counts 2 and 3—Insurance Fraud .......................451
 Count 4—Use of Fire to Commit a Felony ..................451
 Summary—Motion for Judgment of Acquittal—Rule 29(a) ........................452

RULE 29(d) CONDITIONAL DETERMINATION—NEW TRIAL (RULE 33) .........452
 Standard......................................................452
 Analysis—Rule 33(a) .........................................452
 Testimony of Truman, Jr. ................................452
 Prosecutorial Misconduct .................................457
 Cross-examination of Defendant—Witness Credibility ..................458
 Summation and Rebuttal Summation ..............................461
 Conclusion—Prosecutorial Misconduct .............................464
 Summary—Motion for a New Trial—Rule 33(a) ................................464

FINAL CONCLUSION .................................................465

## I. *INTRODUCTION*

Defendant Jeffrey E. Truman, Sr. ("defendant" or "Truman") was indicted on May 6, 2010. The indictment charges Truman with six crimes. *Count 1* of the indictment charges defendant with aiding and abetting another to maliciously damage and destroy, by means of fire, buildings located at 106 North Warner Street/270 Liberty Street, Oneida, New York, in violation of 18 U.S.C. § 2 and 18 U.S.C. § 844(i). *Counts 2 and 3* charge Truman with insurance fraud by causing a large abandoned warehouse ("warehouse") located on the property to be destroyed by fire and then filing a claim stating that the fire damage did not originate with any act or procurement on his part, in violation of 18 U.S.C. § 1341. *Count 4* charges Truman

with knowingly using fire to commit mail fraud (18 U.S.C. § 1341) in violation of 18 U.S.C. § 844(h). *Counts 5 and 6* charge defendant with loan fraud by devising and attempting to devise a scheme to defraud and to obtain money and property from a lender by means of materially false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1341.

A trial before a jury was held on October 19–21, 25–28, and November 1–3, 2010. On October 28, 2010, the government rested its case. Truman moved pursuant to Fed.R.Crim.P. 29(a) for a judgment of acquittal as to each of the six counts in the indictment. The motion was granted with respect to Counts 5 and 6, loan fraud, and those counts were dismissed. Decision

was reserved on defendant's motion as to Counts 1 through 4 of the indictment. Defendant then proceeded with his case, the government presented rebuttal, and the defendant presented rebuttal. At the close of all the evidence, defendant moved for a judgment of acquittal on Counts 1 through 4, pursuant to Fed.R.Crim.P. 29(c). Decision was again reserved.

On November 3, 2010, the jury returned verdicts of guilty against the defendant on Counts 1, 2, 3, and 4 of the indictment. Polling of the jurors individually confirmed that the guilty verdicts were unanimous.

Truman timely filed and served submissions in support of his motions for judgments of acquittal pursuant to Fed. R.Crim.P. 29(a) made at the close of the government's case; pursuant to Fed. R.Crim.P. 29(c) at the close of all the evidence; and in the alternative moved for a new trial pursuant to Fed.R.Crim.P. 33(a). The government opposed, defendant replied, and the government filed a sur-reply without objection from defendant. Oral argument was heard on December 17, 2010. Decision was reserved.

## II. *BACKGROUND*

A summary of the pertinent facts follows. Additional details will be set forth as needed in the analyses.

In November 2005 JMM Properties, LLC ("JMM") purchased property located at 106 North Warner Street/270 Liberty Street, in Oneida, New York, for $175,000. Defendant was a one-third partner, with two others, in JMM.

JMM sought to insure the property and warehouse for $400,000 but eventually obtained a policy for approximately $4 million. JMM started to renovate the warehouse. For example, JMM hired contractors to remove asbestos from the building and to replace parts of the roof.

On November 12, 2006, the warehouse was destroyed by fire. The defendant's son, Jeffrey Truman, Jr. ("Truman, Jr.") admitted setting that fire, and in May 2007 he pled guilty pursuant to a plea agreement to the state criminal charge of arson in the third degree, in Madison County Court. Pursuant to his plea agreement, Truman, Jr. faced a sentence of two to six years, as opposed to the five to fifteen years he would have faced without the agreement. In exchange for the reduced sentence, Truman, Jr. agreed to cooperate and testify truthfully and fully against his father.

State court criminal charges related to arson and insurance fraud were brought against defendant. Truman, Jr. testified in state court that his father had asked him to set the fire, provided the gasoline and kerosene with which to ignite it, and helped him cover it up after the fact. Nonetheless, the state court judge dismissed the charges at the close of the prosecution's case.

Truman, Jr. admitted to using significant amounts of alcohol, marijuana, and cocaine in the months prior to the fire. Truman, Jr. spent the night prior to the fire at his father's camp in the Adirondacks. His father was there, but it is unclear as to whether his younger brother was there as well.

On the morning of the fire Truman, Jr. and his friend Nicholas Fleming ("Fleming") drove Fleming's car to the warehouse and filled the stairwells with cardboard boxes. They parked the car inside the warehouse so it would not be seen. Truman, Jr. walked directly to the area of the warehouse where there were a can of gasoline and a can of kerosene. The two men left the warehouse. Truman, Jr. went to a seafood restaurant that his father owned, retrieved a dark-colored hooded sweatshirt from the back of defendant's truck,

changed from a sweater to the sweatshirt in a laundry room behind the restaurant, walked to the warehouse, and lit the fire. When he set the fire, the building literally imploded, blowing Truman, Jr. backward off his feet into another room and blowing out a large overhead door. The fire singed his hair and eyebrows.

Truman, Jr. ran out into the woods to calm down, then returned to the laundry room, changed back to the sweater, went to the ice skating rink his father owned, walked to the fire scene, and got a ride to his apartment with friends including Fleming. In the early evening defendant picked up Truman, Jr. at his apartment. Truman, Jr. threw his gasoline-soaked shoes into the back of the pick-up truck. The two drove to the ice skating rink, where Truman, Jr. emptied the weekend trash from the dumpster and placed it in the bed of defendant's truck. Defendant drove to his seafood restaurant, and Truman, Jr. retrieved the sweatshirt he had worn in the fire, put it in the back of the pick-up, and emptied half of the trash into the dumpster. They went to a different restaurant for dinner, then proceeded to Conviber, defendant's place of employment, in Syracuse, where Truman, Jr. threw the remaining trash, including the shoes and sweatshirt, into a dumpster.

On a day shortly after the fire, Fleming overheard a conversation in which Truman yelled at his son to "keep his f——ing mouth shut." The directive was sufficiently loud for Fleming to hear it.

About a month after the fire, law enforcement officers brought Fleming to the station for questioning. The police recorded two phone calls between him and defendant. In the first phone call, defendant implied that he did not know anything about the fire. The call disconnected. Truman called back and asked where Fleming was, who he had spoken to, and whose phone he was using. Fleming said that the police had found tire tracks at the scene of the fire and were searching for his car to match up the tire tread. Defendant then offered to purchase used tires for Fleming's car and talked about meeting him later that day.

### III. *RULE 29 JUDGMENT OF ACQUITTAL*

#### A. *Standard*

■ If " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " the jury verdict must be sustained. *United States v. Glenn*, 312 F.3d 58, 63 (2d Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). The evidence must be viewed in the light most favorable to the government, with all reasonable inferences drawn in its favor. *Id.* The evidence must be considered in its totality, and every theory of innocence need not be negated. *Id.* However, deference must be given "to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." *Id.* at 64. Thus, a witness's testimony must be credited, if the jury did so, although the witness pled guilty to serious crimes, testified under a cooperation agreement with the government, and gave testimony filled with inconsistencies. *Id.* Further, direct evidence is not required; circumstantial evidence is sufficient "so long as guilt is established beyond a reasonable doubt." *Id.* However, if there is insufficient evidence in the record "to support a conclusion that, beyond a reasonable doubt, the defendant committed the crime charged," the jury verdict will be overturned. *Id.*

■ When decision is reserved on a motion for a judgment of acquittal before the close of all the evidence, the motion must

be decided "on the basis of the evidence at the time the ruling was reserved." Fed. R.Crim.P. 29(b). Thus, where, as here, decision on a motion made at the close of the government's case is reserved, the motion must be decided on only the evidence presented during the government's case-in-chief. *United States v. Autuori*, 212 F.3d 105, 108 (2d Cir.2000).

However, when a motion for judgment of acquittal made at the close of the government's case-in-chief is denied and a defendant presents a case, then the evidence put in by the defense will also be considered in deciding a Fed.R.Crim.P. 29(c) motion made after the trial ends. *United States v. Velasquez*, 271 F.3d 364, 371 (2d Cir.2001) (distinguishing *Autuori* because in that case decision was reserved at the close of the government's case-in-chief, whereas in the instant case the motion was denied).

**B. *Analysis—Rule 29(a)***

**1. *Count 1—Aiding and Abetting Arson***

Count 1 of the indictment charges Truman with aiding and abetting arson. The indictment alleges that

> On or about the 12th day of November 2006, in the Northern District of New York, the defendant, Jeffrey E. Truman, Sr., did aid, abet, counsel, command, induce, procure, and willfully cause another to maliciously damage and destroy, by means of fire, buildings located at 106 North Warner Street/270 Liberty Street, Oneida, New York used in interstate commerce and in activities affecting interstate commerce [i]n violation of Title 18, United States Code, Sections 844(i) and 2.

Indictment at 1 (Doc. No. 1).

■ In order to find Truman guilty of aiding and abetting arson, the jury must

have found, beyond a reasonable doubt, the following three elements: (1) the arson in violation of 18 U.S.C. § 844(i) was actually committed; (2) defendant knowingly associated himself in some way with that arson; and (3) the defendant participated in the crime by doing some act to help make the crime succeed. *United States v. Hamilton*, 334 F.3d 170, 180 (2d Cir.2003). Decision was reserved on defendant's Rule 29(a) motion at the close of the government's case-in-chief. Accordingly, the motion is resolved based only on the evidence at the close of the government's case-in-chief. *See* Fed.R.Crim.P. 29(b); *Autuori*, 212 F.3d at 108.

One who "maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building ... used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce" violates 18 U.S.C. § 844(i). *United States v. Barton*, 647 F.2d 224, 231 (2d Cir.1981). The government did adduce sufficient evidence from which the jury could have found beyond a reasonable doubt that Truman, Jr. committed arson in violation of section 844(i) in setting fire to the warehouse on November 12, 2006. At issue is defendant's association with and participation in that arson.

The government's key witness connecting defendant to the fire was Truman, Jr. In fact, in oral argument during the trial the government admitted, in response to questioning, that without the testimony of Truman, Jr., the government had no case. The government back-tracked somewhat from that position at oral argument on the post-trial motions, arguing that in addition to Truman, Jr.'s testimony, there was corroboration evidence.

A large part of the corroborating evidence relied upon by the government was that of financial motive. It also points to timing as corroborating evidence; howev-

er, all of the evidence regarding the timing of payments due in relation to the fire go to financial motive. The financial motive evidence as argued by the government is weak in that it did not take into account that defendant was only a one-third partner of the entity that actually owned the building. The other two partners had equal motives. *See Glenn*, 312 F.3d at 65 (noting that although evidence was sufficient to find defendant drug dealer had a motive, other drug dealers had "equal if not greater motives"). The government did not call either of the other two partners as witnesses. There was no evidence that the government considered bringing charges, or even investigating, them although they too had financial motives. There was no evidence about who would benefit from the fire.

■ Moreover, motive is not an element of the crime of aiding and abetting arson. *See* 18 U.S.C. § 2; *id.* § 844(i); *see also* C.J.S. Criminal § 992 ("Motive is not an element of most crimes."). *Cf. United States v. Burden*, 600 F.3d 204, 220–21 (2d Cir.) (discussing the motive element of racketeering in violation of 18 U.S.C. § 1959), *cert. denied*, —— U.S. ——, 131 S.Ct. 251, 178 L.Ed.2d 251 (2010); *Johnson v. United States*, 157 U.S. 320, 325, 15 S.Ct. 614, 615, 39 L.Ed. 717 (1895) (finding no error in jury instructions that the jury could consider absence of proof of motive for killing as requested by defendant, although the instruction that the absence or presence of motive was not necessary to find the defendant guilty was also included). Motive may "refute or support the presumption of innocence," and could establish a state of mind or intent. C.J.S. Criminal § 992; *United States v. MacPherson*, 424 F.3d 183, 185 n. 2 (2d Cir. 2005). As just noted, the evidence that defendant had a financial motive for wanting the warehouse burned down was weak but may tend to refute (although weakly) the presumption of innocence. However, the elements of the crime for which he was charged which are at issue are knowingly associating himself in some way with the arson and participating in the arson by doing some act to help make it succeed. Although knowledge is a state of mind, financial motive does not tend to establish knowledge. Otherwise, state of mind and intent are not at issue. Thus, with no other evidence that Truman knowingly associated with or participated in the arson, the weak circumstantial evidence of financial motive is insufficient to establish beyond a reasonable doubt his knowing association with the arson, nor his participation in it.

■ The government also points to testimony by George Lohr and Dane Miller that at some prior time defendant made comments to the effect that the building would be worth more burned down than in its present state. The government fails to point out that Arthur Pratt ("Pratt") testified that after a previous nuisance fire he joked to Truman that the building would be worth more burned down. Pratt's testimony provides circumstantial evidence that tends to establish that these are the types of offhand comments made by people when, as here, the fact of the matter was that the building indeed was worth more burned down. This is not circumstantial evidence that defendant was associated with or participated in the arson committed by Truman, Jr.

■ Next the government points to a telephone conversation between Truman and his son a few days *after* the fire. Fleming testified that defendant yelled at Truman, Jr. "keep your f——ing mouth shut" loudly enough that Fleming heard it. First, this occurred after the arson. It directs Truman, Jr. to keep quiet about the fire. By this time, defendant obviously

was aware that his son had set the fire. Telling him to keep quiet about it was the natural reaction of a father protecting his son, who was now in trouble not for the first time. Second, it does not implicate defendant in setting the fire. At the most a jury might infer some attempt by Truman to cover up his son's arson. However, it is not evidence of Truman's prior association with or participation in the arson committed by his son.

It must be noted that the indictment charges defendant with aiding and abetting arson, that is, associating himself in some way with the arson and participating in the arson by doing some act to help make the crime succeed. He was not charged with covering-up Truman, Jr.'s arson, nor was he charged with obstruction of justice or some other crime related to after-the-fact actions.

As further circumstantial evidence of Truman's guilt, the government points to recorded telephone calls between defendant and Fleming during which defendant offered to purchase used tires for Fleming's car so that it would not be identified as having been at the warehouse earlier in the day of the fire. Again, this could have been just a father's attempt to help his son. Further, although a jury might infer some attempt by Truman to cover up the arson by his son, it could not infer defendant's prior association with or participation in the arson from this circumstantial evidence. Again, defendant was charged with aiding and abetting arson— not with covering up the crime.

Thus, viewed in the light most favorable to the government, and making every possible inference in its favor, this evidence in its totality is insufficient to sustain a guilty verdict. Based upon this circumstantial evidence, no rational juror could conclude beyond a reasonable doubt that Truman associated with or participated in Truman, Jr.'s arson.

According to the government, the foregoing circumstantial evidence, taken together with circumstantial evidence derived from Truman, Jr.'s testimony, corroborates Truman, Jr.'s previous sworn state court testimony implicating his father in the arson.

Truman, Jr.'s testimony at this trial established the following. He and his father had a conversation about the warehouse the night before the fire. The next day after this conversation Truman, Jr. set the fire. He planned to set the fire on a Sunday so he had alibis. On further questioning about who would have an alibi, he answered "anybody," and when asked "Your father would have an alibi, correct," he answered "Yes."

 Truman, Jr. had asked his father, the defendant, to get a hooded sweatshirt for him, but there was no testimony about when he made this request. Defendant did obtain a sweatshirt and told Truman, Jr. it was in the back of his truck. Truman, Jr. did retrieve the sweatshirt and wore it when he went to the warehouse to set the fire. However, there was no testimony or other evidence that defendant intended or even knew of Truman, Jr. wanting or using the sweatshirt for that purpose. Merely obtaining a sweatshirt for his son is insufficient evidence from which an inference can be drawn that it was done to aid and abet Truman, Jr.'s arson.

It was also established from Truman, Jr.'s testimony that on the evening after the fire defendant picked Truman, Jr. up at his apartment. Truman, Jr. carried the gas- and kerosene-soaked shoes he had worn when he started the fire and threw them in the back of his father's pick-up truck. The defendant drove Truman, Jr. to the skating rink, where Truman, Jr.

loaded bags of trash into the pick-up truck bed. Truman then drove to his seafood restaurant. Truman, Jr. unloaded half of the trash into the dumpster behind the seafood restaurant. He then retrieved his sweatshirt from the laundry room at the restaurant, where he had stashed it after setting the fire, and threw it into the truck bed.

Truman then drove to his workplace, Conviber, in Syracuse. Truman, Jr. testified that he and his father talked about the fire on the drive to Syracuse, but he refused to answer a question posed about the substance of that conversation. Truman, Jr. emptied the trash from the pick-up bed into Conviber's dumpster, along with his sweatshirt and shoes. He testified that the defendant sat in the truck while he took care of the trash, then they went inside the building for his father to pick up some paperwork.

Notably, there was no testimony or other evidence that Truman knew that the shoes his son carried down and put in the truck bed were gas-and kerosene-soaked. There was no testimony or other evidence that defendant knew the shoes were ones his son wore when starting the fire. There was no testimony or other evidence that he knew his son had retrieved a sweatshirt from his truck and then worn it when he started the fire at the warehouse. There was no testimony or other evidence that Truman was aware that his son retrieved the sweatshirt he had worn while setting the fire and threw it into the back of the pick-up truck. There was no testimony or other evidence that defendant knew that his son threw the shoes and sweatshirt into the dumpster at Conviber along with the trash from the skating rink. The only testimony was that the fire, which had just occurred, was mentioned in a conversation. It would be pure speculation to infer from this evidence that Tru-

man was associated with or participated in, by doing some act to help make the crime succeed, his son's arson.

■ The government also points to circumstantial evidence of defendant's knowledge and intent, that is, a false exculpatory statement. Truman, Jr. testified that he rode with his father to Syracuse on the night of the fire. Lt. Emmerich testified that the defendant, during his initial interview, did not mention that he took his son to Syracuse the night of the fire. Even if this evidence could be stretched to support an inference of Truman's knowledge and intent, as the government suggests, it would only support an inference that defendant suspected or knew by the time of the interview that his son had started the fire. This evidence simply does not support an inference that Truman was associated with or participated in the arson. Moreover, even if this could be considered an exculpatory statement,

"falsehoods told by a defendant in the hope of extricating himself from suspicious circumstances are insufficient proof on which to convict where other evidence of guilt is weak and the evidence before the court is as hospitable to an interpretation consistent with the defendant's innocence as it is to the Government's theory of guilt."

*Glenn*, 312 F.3d at 69 (quoting *United States v. Johnson*, 513 F.2d 819, 824 (2d Cir.1975)). Once again, the circumstantial evidence to which the government points relates to after-the-fact conduct to cover up Truman, Jr.'s arson, not prior association with or participation in the crime.

Considered in its totality, the foregoing circumstantial evidence is insufficient for any rational juror to conclude beyond a reasonable doubt that defendant knowingly associated himself in some way with his son's arson; and he participated in the

arson by doing some act to help make it succeed.

Finally, Truman, Jr.'s prior state court testimony, read into the record when he refused to answer certain questions,[1] must be considered. Defendant argues that Truman, Jr.'s testimony, both at this trial and as reflected in the transcript from the state court case, constituted a "perfect storm" of unreliability and untrustworthiness such that it was legally insufficient. Essentially he argues that Truman, Jr.'s testimony was "globally self-cancelling" in that he testified under oath so inconsistently that none of the testimony could make existence of an ultimate fact more or less probable. On the other hand, the government warns against usurping the jury's determinations of credibility, noting that only where testimony is "incredible as a matter of law" can credibility come into play on a motion for judgment of acquittal. *See United States v. Sanchez Solis,* 882 F.2d 693, 696 (2d Cir.1989).

 To be sure, witness credibility is a matter for the jury to be given deference when evaluating the sufficiency of the evidence. *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.1989). "[T]he proper place for a challenge to a witness's credibility is 'in cross-examination and in subsequent argument to the jury'" not in post trial motions. *Id.* (quoting *United States v. Friedman,* 854 F.2d 535, 558 (2d Cir. 1988)). However, credibility may be considered if testimony is "incredible as a matter of law." *Sanchez Solis,* 882 F.2d at 696; *see also United States v. Bermea,* 30 F.3d 1539, 1552 (5th Cir.1994) (finding uncorroborated accomplice's testimony sufficient to sustain guilty verdict unless it was incredible or insubstantial on its face).

 Truman, Jr.'s testimony is suspect for a number of reasons. He was an accomplice who pled guilty to the arson in state court and testified as a prosecution witness. *See United States v. Santana,* 503 F.2d 710, 715–16 (2d Cir.1974) (warning that testimony of accomplices must be viewed with caution because of their possible motivations); *United States v. Falange,* 426 F.2d 930, 933 (2d Cir.1970) (same). He testified in state court pursuant to a plea agreement under which he agreed to testify against his father in exchange for a sentence of two to six years, rather than the five to fifteen years he originally faced. *See Santana,* 503 F.2d at 715–16. He testified in this trial pursuant to a non-prosecution agreement with the government. *See id.*

Truman, Jr. admitted that for months (if not years) before he set the fire he drank twelve to eighteen cans of beer daily. He also drank liquor and whiskey, or whatever was available. He smoked marijuana since he was sixteen, continuing through the time of the fire. He also used cocaine, by snorting it through his nose, during the six to eight months before, and through the time of, the fire. His drug and alcohol abuse impaired his credibility. *See United States v. Pagano,* 207 F.2d 884, 885 (2d Cir.1953) (finding the testimony of "a dope addict with a criminal record" must "be examined with much greater scrutiny than that of an ordinary witness"). Truman, Jr. was also a convicted felon, having been convicted of felony aggravated unlicensed operation of a motor vehicle three times, felony driving while intoxicated more than once, and a parole violation, all in addition to the arson at issue here. *See id.* It further appears that he committed perjury, as indicated by his taking the Fifth

---

1. More details regarding the circumstances in which the prior state court testimony was presented will be discussed in the analysis pertaining to the motion for a new trial. The propriety of permitting the AUSA to present this evidence will also be analyzed.

Amendment twenty-two times during a deposition in a subsequent civil case in response to questions regarding his father's alleged involvement in the fire, about which Truman, Jr. had testified during the state court proceeding. *See id.* His plea agreement pertaining to the state arson charges against him did not encompass any potential prosecution related to perjury.

Truman, Jr. refused to answer questions about his father's alleged involvement. Therefore, the ability of the defense to impeach his credibility with regard to those questions was severely hampered, if not prevented altogether. Thus, the jury's assessment of Truman, Jr.'s credibility is in question because cross-examination as to the substance of his prior state court testimony was precluded. *See Roman,* 870 F.2d at 71 (noting that "the proper place for a challenge to a witness's credibility is in cross-examination and in subsequent argument to the jury" (internal quotations omitted)).

Finally, the prosecution effectively repudiated Truman, Jr.'s credibility by arguing to the jury in summation that in his testimony as part of the government's case-in-chief he had breached the agreement and that the government had no intention of upholding its obligation to refrain from prosecuting him. The agreement required Truman, Jr. to testify truthfully and fully. The government contends that he breached it only by failing to testify fully—by refusing to answer certain questions. The government cannot have it both ways—either he testified "truthfully and fully" or he did not. If, as the government argues, he did not, then his testimony must be given very little, if any, weight. Moreover, there was no evidence before the jury that Truman, Jr.'s testimony contravened the agreement, and that the government therefore was rejecting it.

The conclusion that Truman, Jr.'s testimony was incredible as a matter of law directly follows from the foregoing extensive indicators that he lacked veracity and the absolute absence of any indicia of truthfulness. Based upon this conclusion, the total lack of credibility of his testimony must be considered in weighing the sufficiency of the evidence.

The circumstantial evidence set forth above considered together with the incredible testimony of Truman, Jr. gave "nearly equal" support to a competing explanation for the situation: although there was some evidence of financial motive on the part of defendant that same evidence also provided financial motive to his two partners; comments about the building being worth more burned down were made offhandedly by defendant and other people; defendant purchased a sweatshirt for his son upon request, with no nefarious purpose; the evening of the fire, which was on a Sunday, Truman and his son picked up the weekend trash at the skating rink, dropped some of it at the seafood restaurant and the rest at the dumpster at his workplace in Syracuse as a matter of course; Truman's conversations after the fire with his son and Fleming reflect a father's concern and attempt to minimize the trouble his son was in; Truman, Jr. was a troubled youth with a history of alcoholism and drug abuse who burned down the warehouse in the misguided belief that doing so would help his dad, or even for no reason at all. Where, as here, "if the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *Glenn,* 312 F.3d at 70 (quoting *United States v. Lopez,* 74 F.3d 575, 577 (5th Cir.1996)).

In sum, no rational juror could have found that Truman knowingly associated himself in some way with his son's arson and he participated in the arson by doing some act to help make it succeed. Therefore, his motion for a judgment of acquittal as to Count 1, aiding and abetting arson, will be granted.

### 2. *Counts 2 and 3—Insurance Fraud*

In Counts 2 and 3 of the indictment Truman is charged with insurance fraud. The indictment alleges that from October 2006 to the date of the indictment defendant "devise[d] a scheme and artifice to defraud and to obtain money and property from Erie Insurance Company by means of materially false and fraudulent pretenses, representations, and promises" by filing an insurance claim for the damage to the warehouse caused by the fire and affirming that he did not play a part in originating the fire. Indictment ¶¶ 4–8 (Doc. No. 1).

■ The jury must have found each of the four essential elements of insurance fraud in violation of 18 U.S.C. § 1341 beyond a reasonable doubt in order to convict defendant of each count. The first element is that the defendant knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and property from Erie Insurance Company by means of false or fraudulent pretenses, representations, or promises, the scheme consisting of causing the warehouse to be destroyed by fire and then mailing an insurance claim for money damages representing that the fire damage did not originate by any act, design, or procurement on his part. *See Autuori*, 212 F.3d at 115. These counts pertained to claims packets delivered on February 5, 2007 (Count 2), and February 7, 2007 (Count 3). The second element is that he did so with the intent to defraud and the

third element is that he used the mails or caused the mails to be used. *See id.* at 116. The fourth element is that the false or fraudulent pretenses, representations, or promises were material. *See id.* at 118.

■ In short, the jury must have found beyond a reasonable doubt that Truman caused the warehouse to be destroyed by fire (that is, aiding and abetting Truman, Jr.'s arson) and that he mailed insurance claims packets falsely stating that the fire was not his fault, all with the intention of defrauding the insurance company. It has been determined that no rational juror could have found defendant guilty of aiding and abetting arson beyond a reasonable doubt. Therefore, no rational juror could have found beyond a reasonable doubt one of the essential elements of insurance fraud—causing the warehouse to be destroyed by fire. Truman is entitled to a judgment of acquittal on Counts 2 and 3.

### 3. *Count 4—Use of Fire to Commit a Felony*

The indictment charges defendant with "knowingly us[ing] fire to commit mail fraud, in violation of Title 18, United States Code, Section 1341, a felony prosecutable in a court of the United States [i]n violation of Title 18, United States Code, Section 844(h)." Indictment at 4 (Doc. No. 1).

■ The essential elements of Count 4, violation of 18 U.S.C. § 844(h) are that defendant knowingly used fire to commit insurance fraud. *United States v. Fiore*, 821 F.2d 127, 130–31 (2d Cir.1987). Again, no rational juror could have found beyond a reasonable doubt that Truman knowingly used fire, in essence aiding and abetting arson. Thus, he is entitled to a judgment of acquittal as to Count 4.

### 4. *Summary—Motion for Judgment of Acquittal–Rule 29(a)*

Based upon the evidence presented in the government's case-in-chief, no rational juror could have found the essential elements of aiding and abetting arson against Truman beyond a reasonable doubt. Because the arson was an essential element of both the insurance fraud counts and the use of fire to commit a felony count, no rational juror could have found defendant guilty of those crimes. Defendant's motion for a judgment of acquittal pursuant to Rule 29(a) as to Counts 1, 2, 3, and 4 [2] will be granted in its entirety. Given this resolution of the Rule 29(a) motion, it is unnecessary to consider defendant's Rule 29(c) [3] motion. However, pursuant to Rule 29(d), a conditional determination must be made on the motion for a new trial.

### IV. *RULE 29(d) CONDITIONAL DE-TERMINATION–NEW TRIAL (RULE 33)*

#### A. *Standard*

■■■ There is broader discretion to grant a new trial pursuant to Rule 33 than to enter a judgment of acquittal under Rule 29. *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir.2001). A new trial may be ordered "to avert a perceived miscarriage of justice." *Id.* at 133. Only exceptional circumstances warrant granting a new trial. *Id.* "An example of exceptional circumstances is where testimony is 'patently incredible or defies physical realities.'" *Id.* at 134 (quoting *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir. 1992)). Deference must be given to the jury's credibility assessments unless manifest injustice would result from allowing

the jury's verdict to stand. *Id.* at 133–34. Thus, "the court may weigh the evidence and the credibility of witnesses." *Autuori,* 212 F.3d at 120. However, a balance must be struck "between weighing the evidence and credibility of witnesses and not 'wholly usurp[ing]' the role of the jury." *Ferguson,* 246 F.3d at 133 (quoting *Autuori,* 212 F.3d at 120). An objective evaluation must be made after "examin[ing] the entire case, tak[ing] into account all facts and circumstances." *Id.* at 134. A new trial should be granted when there is "a real concern that an innocent person may have been convicted." *See id.* Additionally, where the evidence in the record is not "'competent, satisfactory and sufficient'" a new trial should be granted. *See id.* (quoting *Sanchez,* 969 F.2d at 1414).

#### B. *Analysis—Rule 33(a)*

There are three areas for consideration in analyzing whether Truman is entitled to a new trial. First, the testimony of Truman, Jr. must be evaluated. Second, the propriety of the government's cross-examination of the defendant eliciting his responses that other witnesses were lying, or otherwise seeking his opinion about the credibility of another witness, must be evaluated. Finally, consideration must be given to the government's principal and rebuttal summations. The final two issues, improperly eliciting credibility assessments and improper summation, are both forms of prosecutorial misconduct.

#### 1. *Testimony of Truman, Jr.*

■■■ As discussed at length above, the testimony of Truman, Jr., who was the government's principal witness, was so

---

**2.** As noted, Counts 5 and 6 were dismissed at the close of the government's case.

**3.** It must be noted that the defendant did testify in his own behalf. Considering his

testimony and comparing it with his son's, a very strong argument can be made that based upon all the evidence a Fed.R.Crim.P. 29(c) judgment of acquittal would be warranted.

lacking in credibility as to be insufficient evidence upon which any rational juror could base a guilty verdict even when taken in conjunction with the circumstantial evidence. That his testimony was "patently incredible" provides exceptional circumstances warranting a new trial. *See Ferguson*, 246 F.3d at 134. Moreover, Truman, Jr.'s prior state court testimony should not have been admitted at trial.

Truman, Jr.'s previous sworn testimony was admitted in the following circumstances. On direct examination, he was asked why he set the warehouse on fire. He did not answer the question. Upon questioning by the Court, he stated that he was not prepared to answer the question. The Assistant United States Attorney ("AUSA") was then asked if he wished to proceed further. At that time, he indicated that he would offer as substantive evidence prior grand jury[4] and state court testimony. The evidence was permitted over defendant's objections. The government again asked Truman, Jr. why he burned down the building, and the witness again refused to answer. He also refused to answer approximately eleven questions posed by the government regarding a conversation between he and his father the night prior to the fire. The government changed its tack and asked details about when and how Truman, Jr. set the fire. Truman, Jr. gave extensive testimony about what he did leading up to the fire, setting the fire, and thereafter. When asked about a conversation between he and his father during a drive to Syracuse on the night of the fire, Truman, Jr. again refused to answer. He did answer questions asked by the government regarding the night of the fire, after returning from Syracuse.

The AUSA directed the witness's attention to the state court transcript. The objection by the defense was overruled. The government then proceeded to read questions and answers from the state court transcript into the record, eliciting from Truman, Jr. that he did recall being asked those questions and giving those answers. In essence, the prior state court testimony was that defendant asked Truman, Jr. to set the fire, and told him where to find kerosene and gasoline in the warehouse.

To summarize the procedural posture leading to the state court transcript being read into the record, Truman, Jr. refused to answer any questions implicating his father. The government argued, at trial and again on this motion, that prior state court testimony was not hearsay pursuant to Federal Rule of Evidence 801(d)(1)(A) (hereinafter "Rule ——"), and therefore was admissible. In objecting to the admission of the state court testimony, the defense argued that a proper foundation was not laid; the witness was unavailable for cross-examination due to his refusal to answer questions; presenting proof in this manner was prejudicial to the defendant; there was no overt inconsistency therefore the evidence was inadmissible hearsay; and admitting such evidence would deprive him of the right to confront witnesses against him.

Rule 801(d)(1)(A) provides that an out-of-court statement given under oath is not hearsay if the "declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement," and it is inconsistent with the testimony given by the declarant at the trial or hearing.

According to the government, Truman, Jr.'s refusal to answer questions constituted inconsistency with the prior state court

---

4. The prior grand jury testimony was not offered. Therefore, only the prior state court testimony is referenced in the remainder of this Memorandum–Decision and Order.

testimony, during which he answered the same or similar questions. *See United States v. Williams*, 737 F.2d 594, 608 (7th Cir.1984). Although no Second Circuit authority for this proposition was offered, for the purposes here it will be accepted. However, in order for this proposition to justify classifying Truman, Jr.'s prior state court testimony as not hearsay, the government must have laid a proper foundation. Truman, Jr.'s silence must have been tested. It cannot be said that his refusal to answer questions was true silence which would justify a ruling that it was inconsistent with his prior state court testimony because it was not tested to determine if his silence and refusal to answer was firm and unchangeable. Upon Truman, Jr.'s refusal to answer certain questions, the government merely moved on to other questions.[5] It never asked that the witness be directed to answer.[6] It

---

5. For example, after Truman, Jr. refused to answer several questions, the AUSA requested permission to use leading questions. He then continued his examination of Truman, Jr. as follows:

Q. Did your father ask you to burn down the building that night, November 11, 2006?

A. I am not answering that.

Q. Okay. Was there any discussion about gasoline and kerosene being in the building?

[Objection overruled.]

Q. Mr. Truman, I asked you a question. Was there any discussion about gasoline and kerosene being in that building?

A. I can't do this. I am sorry.

[Answer repeated upon prompting by the Court.]

Q. Mr. Truman, did your father tell you that he would put gasoline and kerosene in the building for you to use in setting it ablaze? Yes or no?

A. I can't.

Q. Did your father tell you that he wanted that building to burn so he could collect the insurance proceeds because that building was a hassle? Did he tell you that, Mr. Truman? Yes or no?

A. I can't answer these questions.

Q. I am sorry. I can't hear.

A. I can't answer these questions.

[Limiting instruction, questions are not evidence; answers are evidence.]

Q. Was there a discussion that night before the fire as to when you would set the fire? Yes or no? Just was there a discussion?

Let me ask you this, Mr. Truman. When—initially did there come a time when you decided that you would set the building on fire?

A. Yes.

[Additional questions regarding Truman, Jr.'s actions in setting the fire, which he answered.]

6. Upon Truman, Jr.'s initial refusal to answer certain questions, the Court sua sponte excused the jury, as follows:

THE COURT: Can you answer the question? Okay. Members of the jury, we will take a short recess. You may be excused. Don't discuss the case.

[Questioning by the Court out of the presence of the jury; Truman, Jr. answering that he would not answer the question.]

THE COURT: Mr. Broton, are you going to proceed further?

MR. BROTON: I am, Your Honor. I will proceed further. And if necessary, I will offer as substantive evidence testimony, earlier testimony given under oath by this witness in connection with these very inquiries.

. . . .

THE COURT: Well, I am going to allow you to move forward, but it may be subject to limiting instructions to the jury.... All right. Summon the jury, Sam. We will see where we go from here .... [the jury returns].... And, Mr. Broton, you may continue with your questioning.

MR. BROTON: Thank you, Your Honor. Mr. Truman, do you recall giving testimony at another proceeding on March 4, 2010, in connection with this matter?

[Objection to line of questioning regarding grand jury testimony given on March 4, 2010. After argument on the objection out of the presence of the jury, the proceedings continued with the jury present. The jury was given a limiting instruction and direct examination continued.]

MR. BROTON: I want to give you another opportunity to answer this question. Are you

never requested that the witness be held in contempt of court for failing to answer.[7] Only after the witness's silence had been tested in this manner could it have been found to be a true silence justifying a finding that it was inconsistent with prior state court testimony on the matters. Thus, because the government failed to lay a proper foundation it was error to find that the prior state court testimony was not hearsay and therefore was admissible.

In addition, the government also never requested that a finding be made that Truman, Jr.'s silence and refusal to answer was inconsistent with his state court criminal trial testimony. This was particularly problematic in view of the fact that the government knew that he had previously taken the Fifth Amendment twenty-two times in response to the same questions posed to him at a subsequent state court civil deposition. His refusal to answer questions was entirely consistent with his admissions to his lawyer in the civil case that he gave false testimony against his father at the state criminal trial. If he testified under oath in the civil deposition contrary to his testimony at the state court criminal trial, he would have subjected himself to perjury charges in state court. Thus, he took the Fifth Amendment twenty-two times. Likewise, if he testified under oath in this federal criminal trial contrary to his testimony at the state court criminal trial, he would have subjected himself to perjury charges in federal court since his non-prosecution agreement did not include perjury. Thus he refused to answer ten times. His silence *may* have been inconsistent with his state court testi-

mony, but it was *in fact* consistent with his state court testimony being false. Under such circumstances, his state court testimony should never have been admitted for the consideration of the jury.

Truman, Jr. never claimed any lack of memory or that his refusal to answer certain questions was due to a desire to protect his father. In fact, the government never inquired as to those areas. Nor did it make a request for a finding that his refusal to answer would have opened the door to his state court testimony under Rule 806 as inconsistent statements exception to the hearsay rule to impeach or as affirmative evidence of the truth under Rule 801.

Neither did the government request a ruling that Truman, Jr. was unavailable pursuant to Rule 804(a)(2)-(3). As noted, Truman, Jr. was never court ordered to testify concerning the relevant part of his state court testimony concerning his father nor did he claim lack of memory or that he wished to protect his father.

 The error was not harmless, since Truman, Jr.'s state court testimony was the only direct evidence of defendant's association with and participation in the arson. *See United States v. Forrester*, 60 F.3d 52, 64–65 (2d Cir.1995) (finding reversible error where non-hearsay was admitted when there was "a significant resultant prejudice"); *United States v. Ramirez*, 973 F.2d 102, 106 (2d Cir.1992) (finding that where accomplice's "testimony was virtually the government's entire case" significant prejudice arose from failure to properly instruct the jury,

---

willing to tell us why you burned that building down?

 A. No.

 [Objection sustained.]

 Q. Where were you the night before the fire?

[Questioning then continued regarding Truman, Jr.'s activities surrounding the arson.]

**7.** *See supra* note 6.

requiring a finding of reversible error). Admitting the prior state court testimony in error caused substantial prejudice, particularly in the circumstances presented here.

Further, the requirement for the witness's being available for cross-examination also was not met. Because Truman, Jr. refused to answer questions about the very same facts as those in his state court testimony, he was effectively unavailable for cross-examination. Therefore, because the foundational requirements of Rule 801(d)(1)(A) and Rule 804(a)(2)(3) were not met, the prior state court testimony was hearsay and should have been precluded.

██ Moreover, even if the prior state court testimony was properly found to not be hearsay pursuant to Rule 801(d)(1)(A), it should have been precluded as irrelevant under Rule 402 and unfairly prejudicial and misleading under Rule 403. *See Forrester*, 60 F.3d at 62 (concluding that it was error to admit testimony that was not hearsay, where unfair prejudice outweighed probative value and its relevance was limited).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 402. Truman, Jr.'s prior state court testimony did not make any facts more probable than any other facts. The state court testimony cannot be viewed in isolation. Rather, all of his testimony must be considered. A summary of the difficulties with Truman, Jr.'s testimony just set forth in analyzing defendant's Rule 29(a) motion, in order to avoid repeating that extensive analysis, will suffice here. Truman, Jr. testified against his father at the state court trial in exchange for a significantly lesser sentence. He then took the Fifth Amendment to avoid a

perjury charge when asked in a subsequent civil deposition to provide sworn testimony about those same facts. He refused to answer questions about the same facts at this trial. He testified at this trial under a non-prosecution agreement with the government. At the time he set the fire, he was abusing alcohol and illegal drugs. In addition, he had been convicted of multiple felonies. Nothing Truman, Jr. said in any sworn testimony, including at this trial, could properly be credited. Therefore, his testimony could not be said to make any fact of consequence more or less probable than without the evidence. Therefore, the prior state court testimony should have been excluded as irrelevant.

██ Even if the prior state court testimony could have been considered relevant, it would be inadmissible based on prejudice and confusion. Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* R. 403. The probative value of Truman, Jr.'s testimony was very weak, for the reasons set forth above.

Additionally, the prior state court testimony was unfairly prejudicial and misleading. This testimony was the only evidence directly associating Truman with causing the fire to be set except for the government's rebuttal witness, Carrie Dailey ("Dailey"). She recalled a brief conversation that occurred over five years ago among Truman, Jr., his friends, and his father during which, according to her, the defendant told his son to burn the warehouse down. The value of her testimony was very weak because she never came forward to law enforcement with this information at the time of the fire, the ensuing investigation, or during Truman's state court criminal trial. Even prior to the start of this federal court criminal trial

Dailey still did not come forward to law enforcement; rather, during the trial she put information in a blog on the internet. She admittedly did not know the defendant at the time of the alleged conversation, and she did not identify him in open court. Moreover, none of the other people who, according to her, were in the apartment at the time of this conversation testified about such a conversation. The defendant was unable to question these other witnesses about such a conversation because the defense was not aware that the government even alleged that it took place until the rebuttal witness's testimony. Thus, Truman, Jr.'s state court testimony remained the government's principal evidence incriminating defendant, rendering its admission extremely prejudicial.

This testimony also was misleading. Despite this testimony, the state charges against Truman were dismissed at the close of the state's case due to insufficient evidence. However, there was no evidence of this result before the jury.[8] Further, in the later civil deposition, when asked the same questions Truman, Jr. took the Fifth Amendment in order to avoid being prosecuted for perjury. Truman, Jr.'s civil litigation attorney Anthony LaFache testified that he advised him to take the Fifth Amendment in the civil deposition after Truman, Jr. told him that his testimony in the state court trial against his father was not truthful. Finally, because of Truman, Jr.'s refusal to answer questions at this trial, the defendant did not have a full and fair opportunity to cross examine him. *See id.* R. 613.

In sum, Truman, Jr.'s testimony was sufficiently incredible such that it constitutes extraordinary circumstances warranting a new trial. Additionally, it was error to admit his prior testimony from the state court trial pursuant to Rule 801(d)(1)(A) because it was not shown that the prior testimony was inconsistent with his testimony, by silence, at this trial, when that silence was not tested. His silence was, in fact, consistent with the prior state court testimony being false. Further, Truman, Jr. was not available for cross-examination, due to his refusal to answer certain questions. In other words, a proper foundation was not laid for admission pursuant to Rule 801(d)(1)(A).

The prior state court testimony was also inadmissible under Rule 804 because Truman, Jr. was not unavailable as defined by that rule because there was no court order directing him to testify, and his refusal to testify was not based upon a lack of memory. This testimony was also inadmissible as irrelevant, unduly prejudicial, and misleading under Rules 402 and 403.

### 2. *Prosecutorial Misconduct*

 Prosecutorial misconduct must be viewed in the context of the entire trial to determine whether the "'behavior amounted to prejudicial error;'" that is, whether it "cause[d] substantial prejudice to the defendant." *United States v. Nersesian,* 824 F.2d 1294, 1327 (2d Cir.1987) (quoting *United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985)). The first step in the analysis is to determine if there was misconduct. *United States v. Williams,* 343 F.3d 423, 437 (5th Cir.2003). Next it must be determined if the behavior affected the defendant's substantial rights, by considering "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the

---

8. During cross-examination of Dailey, defense counsel inquired about when she learned that the state court case against Truman had been dismissed. Her answer was that she knew nothing about any other trial. Questions by counsel are not evidence, and the jury was so instructed.

efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Id.* at 437–38; *United States v. Caracappa,* 614 F.3d 30, 41 (2d Cir.), *cert. denied,* —— U.S. ——, 131 S.Ct. 675, 178 L.Ed.2d 502 (2010).

### a. *Cross-examination of Defendant– Witness Credibility*

 It is improper to elicit from a witness an opinion as to the credibility of the testimony of another witness. *Forrester,* 60 F.3d at 63. Further, "[p]rosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper." *United States v. Richter,* 826 F.2d 206, 208 (2d Cir.1987); *see also United States v. Gaind,* 31 F.3d 73, 77 (2d Cir. 1994) (explaining and distinguishing *Richter*).

 In cross-examination of Truman, the AUSA asked questions seeking to have defendant characterize multiple witnesses' testimony as a mistake or a lie. Defendant was required to answer the questions over the objections of defense counsel. These questions were as follows:

Q. So when George Lohr testified here, and he said you said that to him, he was *either mistaken or he was lying?*

Q. And when Dane Miller came in here and testified that you told him that the building would be worth more burnt down than up, or words to that effect, he would have *either been mistaken or lying?*

Q. If David Muraco testified under oath here in this courtroom that he met with you fact-to-face on three separate occasions, *that would not be a true statement?*

Q. So he [David Muraco] is *either mistaken or he is lying?*

Q. You did not give him those [leases]. So if he [David Muraco] testified that he got them from you, he was *either mistaken or lying?*

Q. So she [Megan Peckham] was *either mistaken or lying* when she told you that she checked all of the policies, correct—I am sorry, all of the companies in New York?

Q. And is it your testimony today that Ashley Shaughnessy is *either mistaken or lying* about that testimony?

Q. And so Ashley Shaughnessy's testimony that she saw you in the apartment, picking up Junior the afternoon of the fire, discussing the clothes he was wearing in the fire, that testimony, *she is either mistaken or lying?* [Objection sustained— asked and answered.]

Q. And your son, Junior, when he testified that you asked him—when he has testified that you asked him to set this fire, *he is lying.* Is that your testimony?

Q. And when he testifies that you bought him gas and kerosene to use in setting the fire, *he was lying then?*

Q. And *he is lying* when he talks about the fact that he got the clothes to wear for the fire from you?

Q. And *he is lying* when he tells— when he testifies that you took him to Syracuse that evening to get rid of those clothes?

Q. But isn't it true that you wouldn't tell him [the investigator] because in your view *police are the biggest liars on the planet,* isn't that true?

Q. All right. But isn't it true that you would not tell Investigator Paul about this conversation you had with Fleming because he was a police officer and *police officers, in your view, are the biggest liars on the planet;* isn't that true?

As a follow up to the last two questions, the AUSA read from a civil case deposition testimony given by Truman on December 29, 2009, as follows:

Q. Why not?

A. Why would I? *Police are the biggest liars on the planet.* Who knows what he is going to write down on a piece of paper. *They all lie. They lied at my trial, and they lie all the time.*

The government questioned defendant twelve times as to his opinion of the credibility of six prosecution witnesses: George Lohr, Dane Miller, David Muraco, Megan Peckham, Ashley Shaughnessy, and Truman, Jr. The government also focused on Truman's opinion as to the credibility of police officers generally, asking two questions then following up with reading from a deposition transcript defendant's opinion that all police officers are lying. Eliciting opinion testimony from Truman as to the credibility of other witnesses [9] was clearly improper. *See Forrester,* 60 F.3d at 63; *Richter,* 826 F.2d at 208.

According to the government, the holding of *Richter* is constrained to its facts, distinguishable from the facts in this case. In *Richter,* the defendant was asked a series of questions about whether one federal agent was "mistaken or lying," an alternative formulation mitigating the error in asking for an opinion on his credibility. *Richter,* 826 F.2d at 208. The *Richter* Court did note that asking in the alternative lessened the effect of asking for an opinion on credibility. *Id.* However, the government de-emphasizes that the *Richter* Court found that even asking the question in the alternative was im-

proper. *Id.* In addition, the court noted that lack of an objection weighed with the alternative form of the question toward "overlook[ing] the impropriety." *Id.* Thus, despite the "lesser evil" of seeking a credibility determination from the defendant in the alternative and the lack of a defense objection during trial, the impropriety of asking an opinion on credibility, coupled with calling a rebuttal witness to corroborate the witness's testimony, a deliberate misquote of the defendant's testimony in the government's summation, and stating in summation that in order to acquit the jury must find that all government agents were lying, entitled Richter to a new trial. *Id.* at 209.

Here, the government's questions to Truman as to the credibility of the six lay witnesses were whether these witnesses were "mistaken or lying." As in *Richter,* these questions were improper. In *Richter,* the defendant was asked his opinion of the credibility of a single government agent witness. *Id.* at 208. In contrast, here Truman was asked multiple questions about the credibility of six lay witnesses. Although these six witnesses were not government witnesses as in *Richter,* the government read into the record from a transcript of defendant's deposition that police "all lie. They lied at my trial, and they lie all the time." Similarly to *Richter,* defendant was asked his opinion about the veracity of police in general.

The government also relies upon *Gaind,* 31 F.3d at 77, as authority permitting questions in the alternative, whether another witness was "mistaken or lying." In *Gaind,* the defendant was repeatedly

---

**9.** The government argues that *Richter* should have application limited to law enforcement witnesses. However, determination of the credibility of all witnesses is for the jury, not for other witnesses. *Richter,* 826 F.2d at 208; *see United States v. Sullivan,* 85 F.3d 743, 750

(1st Cir.1996) (explaining that the rule in the Second Circuit is that *Richter* applies to lay as well as law enforcement witnesses) (citing *Gaind,* 31 F.3d at 77; *United States v. Scanio,* 900 F.2d 485, 493 (2d Cir.1990)).

asked if government witnesses were mistaken, and twice asked generally whether all government witnesses were lying. *Id.* at 76. The *Gaind* Court distinguished *Richter* based upon the facts. The court noted that in *Gaind* the questions posed were if the lay witnesses were "mistaken," there were multiple witnesses who contradicted defendant's testimony, and the government's summation was accurate. *Id.* at 77. In contrast, the *Gaind* Court delineated the circumstances in *Richter:* the questions posed were whether the government witnesses were "lying," the only other witness was an alcoholic who had been fired from many jobs, and the summation was inaccurate and informed the jury that to acquit defendant it must find all government agents had committed perjury. *Id.*

First it is noted that in both *Richter* and *Gaind* there was no objection to the offending questions during trial, whereas here defense counsel repeatedly objected to these questions. Additionally, here the questions asked were if the witnesses were "mistaken or lying," while in *Richter* the questions were if the witness was lying and in *Gaind* the questions were if witnesses were simply mistaken. *See Richter,* 826 F.2d at 208; *Gaind,* 31 F.3d at 76. The AUSA asked defendant if his son was lying-with no alternative choice of mistaken, as the prosecutors did in *Richter.* Moreover, questioning regarding other witnesses' credibility was the only claim of error in *Gaind,* while in *Richter,* like here, additional errors were claimed. *See Richter,* 826 F.2d at 208–09; *Gaind,* 31 F.3d at 76. The *Gaind* Court concluded that given the "raft" of witnesses against the defendant in doing a plain error analysis there was "no possibility that these questions altered the outcome of the trial." *See Gaind,* 31 F.3d at 77. In contrast, the government's case against Truman was built upon weak circumstantial evidence and a totally incredible witness (Truman,

Jr.) who refused to answer questions implicating the defendant and whose testimony against defendant was (wrongly) brought in by reading from a transcript taken at the state court trial.

Finally, the AUSA followed the questions to Truman about his opinion of the credibility of these lay witnesses with two questions asking if defendant believed all police officers were liars, then when he equivocated the AUSA read from a 2009 deposition transcript of him saying that all police were liars. While the government did not directly ask Truman his opinion of the credibility of the law enforcement officers who had testified at this trial, it did direct questions about his opinion of the credibility of law enforcement officers generally. There is no doubt that the AUSA intended the jury to believe that defendant was impugning the credibility of the officers who testified against him, in essence suggesting an inference that either defendant was guilty or the law enforcement witnesses were lying. Although in *Richter* the prosecutor directly argued that if the law enforcement agents were telling the truth then the defendant was guilty, the AUSA's questions here lead to a suggested inference not that much different—defendant could only be acquitted if the law enforcement officers were lying. *See Richter,* 826 F.2d at 209. Similar to the situation in *Richter,* here the fundamental issue was whether Truman asked his son to set the fire and facilitated that act, not whether the law enforcement officers were truthful. *See id.* ("It is patently misleading to argue that the resolution of this issue hinges upon the veracity of the FBI agents.") Thus, it cannot be concluded that this case is governed by *Gaind* rather than *Richter.*

The government also points to several other cases in support of its argument that the questions on cross-examination at issue

here do not require a new trial. In *United States v. Newton*, 72 Fed.Appx. 855 (2d Cir.2003) (summary order), the court explained that in *Richter* reversal of the convictions was required due to the "combined force of cross-examination, improper rebuttal testimony, and a misleading summation, during which the prosecutor deliberately misquoted Richter's testimony and told the jury that government agents must be lying for Richter to be innocent." *Id.* at 856. The court determined, in contrast with *Richter*, that it was necessary to focus on defendant's veracity because it was a central issue in the case given that he was charged with making false statements. *Id.* at 856–57. The lesson taken from *Newton* is that, although it was improper to question defendant as to his opinion whether other witnesses lied in their testimony, it may not be plain error where a defendant is charged with false statements thus putting his veracity in issue. *Id.* at 857 (noting that plain error analysis done because there was no defense objection at trial). Thus, *Newton* is inapplicable where, as here, the defendant was not charged with false statements. *Id.*

In *United States v. Weiss*, 930 F.2d 185 (2d Cir.1991), the court distinguished *Richter* because the questions to the defendant did not limit characterization of the witnesses' testimony as "incorrect or lying," the witnesses about whose testimony he was questioned were lay witnesses not government agents, there was no rebuttal witness to buttress the witnesses' testimony, and the government did not argue in summation that in effect the jury must find all government witnesses lied in order to acquit the defendant. *Id.* at 195. However, unlike *Weiss*, here the government consistently limited defendant's option to characterize witnesses' testimony as "mistaken or lying," and some of the questions did address law enforcement witnesses generally. It is also noted, al-though the *Weiss* Court did not rely on it, that the defendant in that case was charged with making false statements, which directly put his veracity in issue. *See id.* at 188.

In sum, the AUSA's questioning on cross-examination that compelled Truman to opine on the credibility of other witnesses' credibility (both lay and law enforcement witnesses) was improper. Pursuant to *Richter*, consideration of whether this improper questioning requires a new trial will be undertaken after the other alleged misconduct is considered. *Richter*, 826 F.2d at 208–09.

### b. *Summation and Rebuttal Summation*

■ Due to the "inherent controversial nature of litigation" counsel has "substantial latitude" in making closing arguments. *Id.* at 209. However, in a criminal case the prosecutor "has a 'special duty not to mislead.'" *Id.* (quoting *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962)).

■ During the government's principal summation the AUSA denounced Truman, Jr.'s testimony and literally tore in half the non-prosecution agreement. The jury was told that Truman, Jr. broke the agreement by failing to cooperate and testify truthfully, and the government now had no intention of meeting its non-prosecution obligation. This could be misleading to the jury because, in effect, the government was arguing that Truman, Jr. failed to cooperate and testify truthfully while at the same time asking the jury to believe Truman, Jr.'s state court testimony implicating his father. In addition, there was no evidence admitted at trial that the government repudiated the non-prosecution agreement, upon which such an argument could be based, further misleading the

jury. This showboating by the AUSA drew attention to this argument, even when there was no evidentiary foundation for it. Using a demonstrative act such as dramatically ripping the paper further exacerbated the false impression this argument presented to the jury. This argument, along with the presentation method used by the AUSA, far exceeded the "substantial latitude" afforded counsel in closing arguments.

■ During the government's rebuttal summation the AUSA emphasized the questions posed to defendant in cross-examination compelling him to give an opinion as to the credibility of other witnesses. Notably, the government argued that those questions were proper under *Richter* because the defendant was not limited to opining that the other witnesses were lying but rather that they were "mistaken or lying." Yet in his rebuttal summation the AUSA specifically stated that the defendant said these other witnesses were lying, as follows: "And of course, the defendant will tell you, no, *George Lohr is lying. Dane Miller is lying.*"

The government's rebuttal summation also highlighted the defendant's prior sworn statement of his opinion regarding police officers' veracity:

It is telling when you hear a witness, any witness tell you under oath that *cops are the biggest liars on the planet. That they all lie.* That's telling. That statement was made in 2009 by the defendant. . . . And the defendant's response to that was: Why would I? *Cops are the biggest liars on the planet. They all lie.* They have ruined my life.

Moreover, the government in essence argued to the jury that in order to believe Truman, they must disbelieve all of the prosecution's witnesses, and further that all of those witnesses would be lying to

convict an innocent man. The AUSA argued:

The defendant testified in this case. *To believe the defendant's testimony requires you, requires you, to disbelieve the testimony of at least nineteen witnesses* who came in here and swore under oath and testified before you, at least nine independent witnesses who didn't know one another, who came in here separately and testified. And that includes Dane Miller, George Lohr, David Muraco, Arthur Pratt, witnesses—Megan Peckham, the witnesses that Ms. Carroll mentioned to you earlier. *Do you really believe that each of those witnesses came in here and lied to convict an innocent man?*

It is unclear whether the nineteen witnesses referenced include law enforcement witnesses. Certainly law enforcement witnesses could be included in that number, since the other thirteen witnesses were not specified. This comes perilously close to an argument that to find the defendant innocent the jury must have found that law enforcement witnesses were lying, a prohibited argument. *See Richter*, 826 F.2d at 209.

■ In summation for the defendant, it was highlighted that Dailey, the government's rebuttal witness, did not identify the defendant in the courtroom, in contrast to most other prosecution witnesses. This point was significant because Dailey testified that she did not know Truman before the evening she allegedly overheard him offer his son and his son's friends money to burn down the warehouse. In his rebuttal summation the AUSA stated that he may have forgotten to ask witnesses some questions. His argument was as follows:

And also, this has been—there are going to be things I am going to forget to say here because of the nature of this trial in itself, and we are not perfect. Try as

we can to be perfect and to remember everything, we can't. *And I should have asked some witnesses some questions, and I didn't. And with Carrie Dailey,* I didn't. And that's all I can tell you about that. I should have, and I didn't. I apologize to you for that. But nobody is perfect.

This directly followed the argument about Dailey's testimony. What the government was suggesting was that if she had been asked to identify defendant in court, Dailey would have recognized him and been able to point him out. In fact, Dailey did not point out defendant in the courtroom, and there is no evidence to suggest that she could have pointed him out. To the contrary, there was evidence that she may not have been able to recognize him—she had not met him before the day of the conversation she allegedly overheard in June or July 2006. She only saw him one other time shortly after that, and she never came forward over the course of four years. This constitutes improper vouching by the prosecutor. *See Nersesian,* 824 F.2d at 1328.

The government contends that because it did not explicitly tell the jury that Dailey would have identified Truman in court if she had been asked, it was well within the "broad latitude in the inferences it may reasonably suggest to the jury during summation." *See United States v. Cohen,* 427 F.3d 164, 170 (2d Cir.2005) (internal quotation omitted). According to the government, this case is very similar to *United States v. Salameh,* 152 F.3d 88 (2d Cir.1998). In *Salameh,* the government in its summation referenced a witness and stated that he testified that the defendant "Mahmoud Abouhalima" had helped him and another accomplice. *Id.* at 135. However, the trial transcript reflected that this witness testified that a "Mohammad Abouhalima" had helped he and another accomplice. *Id.* The defendant argued in

summation that the trial transcript reflected that the witness had said "Mohammad," the defendant's brother, and not the defendant "Mahmoud." *Id.* In rebuttal the government argued that the witness had actually said "Mahmoud" and the court reporter had made a mistake. *Id.* The government also pointed out that on cross-examination defense counsel had the witness point out Mahmoud. *Id.* On appeal, the defendant argued that this constituted improper vouching by the government, depriving him of a fair trial. *Id.* In declining to find that this constituted improper vouching, the court pointed out that the prosecutor followed his argument about the mistake with recitation of an "array of proof confirming that [defendant] (and not his brother Mohammad) had assisted" the witness in the criminal activity and also pointed out that telephone records reflected no calls to Mohammad. *Id.* at 135–36.

In a nutshell, in *Salameh* an argument that there was a mistake in the transcript of trial testimony which was supported by an array of other evidence was found not to be government vouching. *Id. Salameh* is not in any respect similar to this case. Here the government suggested implicitly that Dailey would have identified defendant had she been asked. There was no mistaken transcription or recall of Dailey's testimony. There was no question of the accuracy of recollection. Dailey never identified the defendant because she was not asked to do so. The government was asking the jury to invent evidence for which there was no basis. This is improper vouching.

The government also cites to *United States v. Parker,* 903 F.2d 91 (2d Cir.1990), arguing that it is entitled to significant latitude in its arguments. In *Parker* the prosecutor argued in summation that a

witness's cooperation agreement with the government gave him "a motive to tell the truth in preference to lying." *Id.* at 101. The court noted that this argument was made in the context of acknowledging that the witness "was not a model citizen" and not urging the jury to believe the witness because the government said he was telling the truth. *Id.* In contrast, here the government asked the jury to make an inference with no evidentiary basis, far exceeding the latitude to which it is entitled.

■■■ The government contends that even if the statement made during summation was improper, the impropriety is mitigated by defendant's failure to object. *See United States v. Perez,* 242 F.3d 369 (2d Cir.2000) (unpublished table decision; summary order at No. 99–1151, 2000 WL 1804518, at *3). Truman did not object to this portion of the rebuttal summation, which may slightly mitigate the AUSA's improper argument during rebuttal summation. However, the other evidence against Truman was weak at best, in contrast to *Perez,* where there was overwhelming evidence against the defendant. *See id.* at *4. Thus, the very slight mitigation (due to defendant's failure to object) is insufficient to carry the influence of the government's improprieties from harmful to *harmless.*

#### c. Conclusion—Prosecutorial Misconduct

Making a grand show of tearing up Truman, Jr.'s non-prosecution agreement in the government's principal summation had potential to mislead the jury. During rebuttal summation, the government improperly emphasized defendant's testimony opining as to other witnesses' credibility. Further, it was improper vouching to implicitly state that the jury should draw an inference that Dailey would have identified Truman in court if she had been asked.

Tearing up Truman, Jr.'s non-prosecution agreement was misleading and extremely prejudicial, particularly given the argument's lack of evidentiary foundation. Taken together with the emphasis on defendant's opinions on other witnesses' credibility and the statement regarding Dailey, the prejudicial effect was very strong. There were no cautionary instructions to mitigate prejudicial effects, other than the standard instructions regarding witness credibility.

Moreover, the strength of other evidence supporting conviction was extremely weak. Truman, Jr., the prosecution's key witness, was patently incredible for the reasons set forth above. His improperly admitted prior state court testimony was the only direct evidence linking Truman to any wrongdoing prior to the fire, other than the single alleged conversation in June or July 2006 to which Dailey testified in rebuttal. The remaining circumstantial evidence was so weak as to be insufficient to sustain a conviction. In the context of the entire trial, the prosecutors' statements were prejudicial error causing substantial prejudice to Truman.

#### C. Summary—Motion for a New Trial—Rule 33(a)

Extraordinary circumstances warranting a new trial are presented by Truman, Jr.'s patently incredible testimony. Moreover, his previous state court testimony should have been excluded. It was improper for the government to elicit from Truman his opinion as to the credibility of other lay witnesses, as well as through previous testimony his opinion that all police officers are liars. The dramatic repudiation of the non-prosecution agreement between the government and Truman, Jr., without any record evidence to support it, must have

misled the jury. The AUSA's statements in rebuttal summation emphasizing defendant's opinions as to other witnesses' credibility and to the effect that Dailey would have identified him in court had she been asked to do so affected his substantial rights, particularly in light of the extremely weak evidence linking him to the warehouse fire. An objective evaluation made after examining the entire case against Truman, and taking into account all of the facts and circumstances, leads to a real concern that an innocent party may have been convicted. A new trial must be ordered to avert a miscarriage of justice. *See Ferguson*, 246 F.3d at 133–34.

## V. *FINAL CONCLUSION*

Upon completion of the government's case-in-chief, no rational jury could have found beyond a reasonable doubt that Truman aided and abetted arson or committed insurance fraud and use of fire to commit a felony. Thus, he is entitled to a judgment of acquittal pursuant to Fed.R.Crim.P. 29(a). Further, he must be conditionally granted a new trial pursuant to Fed. R.Crim.P. 29(d) and 33(a) in order to prevent a miscarriage of justice.

Accordingly, it is

ORDERED that

1. Defendant Jeffrey E. Truman, Sr.'s motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(a) is GRANTED;

2. The jury verdict is set aside;

3. The indictment is DISMISSED in its entirety; and

4. In accordance with the directive of Fed.R.Crim.P. 29(d), a conditional determination is made that defendant Jeffrey E. Truman, Sr.'s motion for a new trial pursuant to Fed.R.Crim.P. 33(a) on Counts 1, 2, 3, and 4 is GRANTED.

The Clerk of the Court is directed to enter a judgment of acquittal accordingly.

IT IS SO ORDERED.