UNITED STATES of America, Appellee,

v.

**James RICHTER, Defendant-Appellant.**

**No. 617, Docket 86–1393.**

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1987.

Decided Aug. 20, 1987.

---

Herald Price Fahringer, New York City (Diarmuid White, New York City, on the brief), for defendant-appellant.

Larry Krantz, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D. N.Y. and Matthew E. Fishbein, Asst. U.S. Atty., E.D.N.Y., of counsel), for appellee.

Before FEINBERG, Chief Judge, VAN GRAAFEILAND and PIERCE, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Following a jury trial before Judge Bramwell in the United States District Court for the Eastern District of New York, James Richter was convicted of knowingly possessing and disposing of $54,250 in illicitly obtained traveler's checks. 18 U.S.C. §§ 2113(c) and 2. He contends on appeal that he is entitled to a new trial because of prosecutorial miscon-

duct and because the district court erred in permitting the Government to call a rebuttal witness. Because we believe that the prosecutor's conduct constituted plain and prejudicial error, we reverse.

The principal Government witness was Raymond Von Braunsberg, an alcoholic who had been fired from numerous jobs for mismanagement and incompetence and who had successfully concealed his work record from subsequent employers. Richter became acquainted with Von Braunsberg in 1978, when Von Braunsberg was manager of a branch bank with which Richter did business. They became close, personal friends. Von Braunsberg arranged bank loans for Richter and paid his overdrafts. Richter, in turn, made personal loans to Von Braunsberg. Their personal relationship continued after Von Braunsberg lost his bank job.

In February 1983, Von Braunsberg became branch manager of another bank. That spring, he was instructed to inventory and destroy the bank's Thomas Cooke traveler's checks and to confirm with Thomas Cooke by letter that the checks had been destroyed. Although Von Braunsberg informed Thomas Cooke that $54,250 in checks had been shredded, he had in fact concealed them in his office desk drawer. Before Von Braunsberg left for vacation in mid-July 1983, he put the checks in an attache case and took them home. He expected he soon would be fired once again, and, shortly thereafter, he was.

Von Braunsberg testified that the day after he was fired he took the traveler's checks to Richter's apartment, told Richter he had been fired and requested a loan of $200 or $250. He showed Richter the traveler's checks and explained how he had taken them from the bank. When Richter offered to pass the checks on to a contact for resale, Von Braunsberg left the checks with him. According to Von Braunsberg, he decided on the following day to destroy the checks, and he arranged with Richter to pick them up. However, after retrieving the attache case from Richter's apartment, he found that it contained only magazines. He called Richter to inquire about the miss-

ing checks and was informed that they had been destroyed.

It is undisputed that the checks had not been destroyed. Most of them turned up in Florida during August and September of 1983. In November 1983, Von Braunsberg admitted to FBI Special Agent Frank Lazzara that he had taken the checks from the bank and passed them on to Richter.

Lazzara testified that, when he and FBI Agent Douglas Corrigan interviewed Richter, Richter told them that he had received a call from Von Braunsberg in early August telling him he had been fired and asking for a loan and help in finding a new job. Richter also stated that, when Von Braunsberg arrived at his apartment, he opened an attache case and showed Richter the traveler's checks. Von Braunsberg sought and received permission to leave the checks with Richter because Von Braunsberg believed his apartment might be searched by the police. Richter told Lazzara that he decided to destroy the checks, and he showed Lazzara the trash chute down which he claimed to have thrown them. He stated that he then put magazines in Von Braunsberg's attache case, which Von Braunsberg came and got. Richter also claimed that, when Von Braunsberg later called to ask about the checks, he told Von Braunsberg they had been destroyed.

Richter, testifying on his own behalf, said that Von Braunsberg told him he had the checks in his possession for the purpose of destroying them. Leaving "to meet somebody", Von Braunsberg asked if he could keep the attache case at Richter's apartment for one or two days. The next day, Von Braunsberg returned to retrieve the checks and asked to borrow some of Richter's magazines. He put the magazines inside the attache case with the checks and left.

Richter admitted he lied to Agent Lazzara about destroying the checks, because Von Braunsberg had said he was going to destroy them "[a]nd I had no reason to doubt him." He reasoned:

I believed that I was doing something for a man whom I in no way believed was guilty, a man who had all these other problems, and a man who had told me that he had planned to destroy them.

Richter denied telling Lazzara that Von Braunsberg showed him the traveler's checks when he first arrived at Richter's apartment; that Von Braunsberg told him he had been fired; that he, not Von Braunsberg, had placed the magazines in Von Braunsberg's attache case; and that Von Braunsberg asked to leave the checks at his apartment because he was afraid the police might search his home and find them. He also denied showing Lazzara the kitchen, where he claimed to have ripped up the traveler's checks, or the trash chute, where he claimed to have thrown them.

Pointing to the discrepancies between Lazzara's testimony concerning Richter's statements to him and Richter's testimony on the stand, the prosecutor asked Richter in a series of questions to testify that Lazzara was either mistaken or lying. This was improper cross-examination. Determinations of credibility are for the jury, *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944), not for witnesses, *Greenberg v. United States*, 280 F.2d 472, 475 (1st Cir. 1960). Prosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper. *See People v. Montgomery*, 103 A.D.2d 622, 481 N.Y.S.2d 532 (1984) (per curiam); *People v. Davis*, 112 A.D.2d 722, 724, 492 N.Y.S.2d 212 (1985) (*mem.*).

Because the prosecutor in this case gave the defendant an alternative of branding Lazzara's testimony as either a lie or a mistake and because no objection was taken by defense counsel, we might be inclined to overlook the impropriety if that were defendant's sole claim of error. However, the Assistant United States Attorney did not stop there. Over the objection of defense counsel, the AUSA called FBI Agent Corrigan as a rebuttal witness for the purpose of corroborating Lazzara's testimony, which the prosecutor already had forced the defendant to label as false.

Then, in his summation, which followed closely upon Corrigan's testimony, the

prosecutor focused on the discrepancies between Richter's statements to the agents and his testimony. He argued that "if [the jurors] find that the FBI agents are telling the truth, then Mr. Richter is guilty and his guilt has been established." He said:

> Members of the Jury, there is another compelling reason why Mr. Richter's testimony on that stand is unworthy of your belief, and that is because it's completely inconsistent with his direct testimony on not one but two FBI agents.
>
> You heard Mr. Richter on the witness stand. I asked him time and time again, isn't it a fact, sir, isn't it a fact that you admitted to the FBI that when Mr. Von Braunsberg gave you these checks he told you that he had taken them from the bank, and he said No, I never said that to them. Then they are mistaken or lying. Over and over again, the agents are lying to get me. That's what Mr. Richter wants you to believe. And ask yourselves why. Why would two agents of the FBI, with some 30 to 40 years of experience between them, come into this courtroom and commit perjury and risk their careers to get Mr. James Richter? Why would they do that?

> \*   \*   \*   \*   \*   \*

> So, members of the Jury, I submit that you can determine that Mr. Richter is not telling you the truth because if he is, then these two agents, over and over again, in this courtroom, committed perjury.

Coupled with what had gone on before, we are satisfied that these comments were so prejudicial as to require the granting of a new trial. In the first place, the prosecutor, by deliberately misquoting Richter's testimony, emphasized the improper nature of the questions he had forced Richter to answer:

> Over and over again, the agents are lying to get me. That's what Mr. Richter wants you to believe.

Although the inherent controversial nature of litigation permits substantial latitude in the closing arguments of counsel, the prosecutor in a criminal case has a "special duty not to mislead," *United States v. Universita,* 298 F.2d 365, 367 (2d Cir.), *cert. denied,* 370 U.S. 950, 82 S.Ct. 1598, 8 L.Ed.2d 816 (1962), and should not deliberately misstate the evidence, *United States v. Suarez,* 588 F.2d 352, 354 (2d Cir.1978); *United States v. Burse,* 531 F.2d 1151, 1154 (2d Cir.1976).

The obvious purpose of the prosecutor's comments was to frame the controversy as if it were Richter against the FBI. His statement that if "the FBI agents are telling the truth, then Mr. Richter is guilty", clearly demonstrated this purpose. Moreover, it was an improper statement of the law, which the district court should have clarified in response to the defendant's objection and requested charge. The fundamental issue in this case was whether Von Braunsberg told Richter that he intended to destroy the checks and whether Richter returned the checks to Von Braunsberg for that purpose. It is patently misleading to argue that the resolution of this issue hinges upon the veracity of the FBI agents. *United States v. Reed,* 724 F.2d 677, 681 (8th Cir.1984); *United States v. Vargas,* 583 F.2d 380, 386–87 (7th Cir.1978).

Moreover, prosecutors have been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents must be lying. *See, e.g., United States v. Hestie,* 439 F.2d 131, 132 (2d Cir.1971) (per curiam); *United States v. Drummond,* 481 F.2d 62, 64 (2d Cir.1973); *United States v. Davis,* 328 F.2d 864, 867 (2d Cir.1964). The prosecutor's comments in the instant case are strikingly similar to those that were condemned in *People v. Yant,* 75 A.D.2d 653, 427 N.Y. S.2d 270 (1980) *(mem.).* There, the court found error in the prosecutor's "statements on summation to the effect that, in order to acquit defendant, the jury would have to find that the officers had committed perjury and risked their careers which totaled over 30 years of service." *Id.* at 654, 427 N.Y.S.2d 270. *See also People v. Ingram,* 49 A.D.2d 865, 374 N.Y.S.2d 327 (1975) *(mem.)* ("the prosecutor improperly argued in summation that an acquittal would be tantamount to a finding that the police

officers who testified for the People were guilty of perjury").

We do not know whether the calling of FBI Agent Corrigan as a rebuttal witness was part of a plan to first force the defendant to characterize an FBI witness as a liar and then call a second FBI witness to discredit the defendant's testimony. Whether or not this was the case, because we believe that appellant is entitled to a new trial in any event, we need not reach the question whether the district court abused its broad discretion in permitting the second FBI agent to testify in rebuttal. *See Geders v. United States*, 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976).

Reversed and remanded for retrial.