NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0498n.06

No. 09-4529

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 19, 2011*

LEONARD GREEN, Clerk

UNITED STATES OF AMERICA, )
)
Plaintiff–Appellee, )
)
) ON APPEAL FROM THE UNITED
v. ) STATES DISTRICT COURT FOR THE
) SOUTHERN DISTRICT OF OHIO
ELISHA LACY DICKENS, )
)
Defendant–Appellant. )
)

Before: KEITH, GIBBONS, and WHITE, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. On June 7, 2008, Christopher Roush was killed during the course of a robbery gone awry. That evening, Michael Haynie entered Roush's home pursuant to a plan concocted by Adam McClellan and Elisha Lacy Dickens to rob Roush of money and drugs. After Haynie entered Roush's home, a struggle ensued in which Haynie struck Roush twice in the head with a gun. The gun discharged and hit Roush in the back of the head, killing him.

Dickens was convicted by a jury of interstate stalking, drug trafficking crimes, and firearms crimes and was sentenced to a total of 600 months' imprisonment. He now appeals his conviction and sentence, arguing that reversal of the conviction is warranted based on prosecutorial misconduct and that his sentence is unreasonable. For the following reasons, we affirm Dickens's conviction and sentence.

-1-

I.

Defendant–appellant Elisha Lacy Dickens lived in Meigs County, Ohio, across the river from Mason, West Virginia. Dickens was previously convicted of attempted assault, drug possession, and drug trafficking. Dickens admitted to selling and using cocaine prior to this arrest.

While Dickens was in prison, Adam McClellan, a drug dealer and user, moved to Meigs County. McClellan sold drugs to and spent some time living with Frank Dickens, Dickens's brother.[1] Frank purchased drugs from McClellan and another drug dealer and sold most of them to the victim, Christopher Roush. Eventually, Frank introduced McClellan to Dickens. When Frank and McClellan had a disagreement, McClellan went to stay with Dickens. While McClellan was living with Dickens (about a week before Roush was killed), Frank went to Dickens's house to confront McClellan about a woman. During the fight, Frank hit McClellan in the face, giving him two black eyes, and McClellan cut Frank with a knife.

After the confrontation with Frank, McClellan and Dickens began to make progress on a plan to set up a "trap house" for the purpose of selling drugs. Neither McClellan nor Dickens wanted to stay in the house, so McClellan asked Michael Haynie, who was in need of work and a place to stay. On Friday, June 6, 2008, Haynie drove to Meigs County in a white 1992 Dodge Spirit and met McClellan at the last rest stop before West Virginia. The two left this rest stop in McClellan's green pickup truck and eventually met with Dickens at his house. Haynie understood that they were going

---

[1]We will refer to the appellant, Elisha Lacy Dickens, as Dickens, and his brother, Frank Dickens, as Frank.

to "hit a lick," meaning that they were going to do something illegal in order to get drugs or money for drugs. The three men left together in Dickens's red truck to pick up Haynie's car. McClellan filled Haynie's white 1992 Dodge Spirit up with gas paid for by Dickens.

Haynie testified that the three men drove around in Haynie's Dodge Spirit looking at various drug dealers' homes and discussing possible robbery victims. Haynie testified that Dickens "settled on" Roush's house in West Virginia because this would mean that he could take "his competitor's drugs." McClellan and Dickens explained to Haynie that Roush's drug supply came from Dickens's brother Frank, and Haynie testified that he thought Dickens was "more in it for the money" and McClellan was "out for revenge for the two black eyes."

That night the three returned to Dickens's house. Haynie testified that they formulated a plan in which McClellan would drive and Haynie would rob Roush. Then, according to Haynie, Dickens pulled out a .45 caliber handgun and gave it to Haynie. (Dickens maintains that the gun used to shoot Roush was stolen from his mother's home, and McClellan later said that he stole the gun from Dickens and gave it to Haynie.) McClellan and Haynie drove to Roush's house but left because no one was home. Later that evening, between 11:42 p.m. and 1:45 a.m., McClellan and Dickens called each other a number of times. Phone records also show that, in the early morning hours of June 7, Dickens called Roush's house two times and called a friend of Roush's, but Dickens denies making these calls. At some point Haynie and McClellan returned to Dickens's house. Haynie returned the gun to Dickens. At about 3:00 a.m. Dickens reserved a room for McClellan and Haynie at the Mason Hotel in West Virginia. They checked in using a false name.

In the morning, McClellan woke up sick and stayed in bed most of the day. At some point they went to get McClellan morphine. According to Haynie, McClellan and Dickens communicated by phone throughout the day and met at a gas station. Later in the evening of June 7, Haynie testified that he, McClellan, and Dickens were together in the Mason Hotel planning the robbery. McClellan had the .45 in his bag, and Dickens came to the hotel with bandanas. After 20 or 30 minutes of planning, Dickens returned to Ohio. When it got dark, McClellan and Haynie dressed in dark clothes, baseball caps, and bandanas. The two drove the Dodge Spirit to Roush's house at approximately 10:00–10:30 p.m. Haynie went to the door of Roush's house while McClellan waited in the car. Shane Leach answered the door, and Haynie instructed Leach to give him drugs and money. When Leach said there were none, Haynie racked the slide of the gun and struck Leach, causing Leach to run from the house. When Haynie was inside the house, he struck Roush with the gun and knocked him to the floor. This strike caused the gun to discharge into the ceiling. When Roush got up from the floor, Haynie struck him again with the gun, which discharged a bullet into Roush's head. Haynie fled, and he and McClellan went back to Ohio. The men threw the gun and bandanas into a pond and drove to Athens, where McClellan planned to meet up with Dickens but never did.

Dickens participated in a series of interviews with law enforcement during the investigation. His story changed substantially from July 23 to September 9 to December 16, 2008. Regarding the gun used to kill Roush, Dickens first claimed that the two guns at his mother's home were missing on the night of Roush's death. He subsequently told police that McClellan had been at Dickens's

mother's home and might have stolen the guns. Regarding his communications with McClellan on the day of Roush's death, Dickens first stated that he received a call from McClellan on the night of Roush's death in which McClellan said that "[Roush] would not be competition anymore." In a later interview, he told agents that he never discussed the homicide with McClellan and that he could not recall why he and McClellan spoke so many times on the phone the night of the murder. During the interview on December 16, Dickens stated that he spoke to McClellan a few times on the day of the murder and that McClellan claimed to be in Columbus and failed to give Dickens a clear answer about Roush. At this time Dickens had no answers to questions about why his red truck was at the rest stop on the day before the murder and at the gas station later. Later on December 16, Dickens said that McClellan had introduced him to Haynie on the day of Roush's death and the three men drove to West Virginia, specifically Roush's house, in the white car and spoke of robbing people. Dickens admitted that he paid for a hotel room for McClellan and Haynie. Dickens also admitted that McClellan called Dickens to tell him that they had accidentally shot Roush and said that Dickens refused to answer future calls from McClellan. Regardless, Dickens claimed that he had no prior knowledge of the robbery.

Haynie was arrested on July 29, 2008, and McClellan surrendered himself to authorities on July 31, 2008. On August 26, 2008, a grand jury returned a six-count indictment against McClellan and Haynie. On January 5, 2009, Haynie pled guilty to three counts of the original indictment. He was sentenced to 687 months' imprisonment. On January 6, 2009, the grand jury returned a six-count superseding indictment against McClellan and Dickens. The indictment charged McClellan

and Dickens with travel in interstate commerce with intent to injure or harass another that resulted in death; travel in interstate commerce with intent to commit a crime of violence in furtherance of an unlawful activity; using, carrying, brandishing, and discharging a firearm in relation to a crime of violence resulting in murder; and conspiracy to possess with intent to distribute cocaine and cocaine base. On May 27, 2009, McClellan was convicted on all six counts and sentenced to a total of 480 months' imprisonment.

On June 19, 2009, a jury convicted Dickens on all six counts. Dickens was sentenced to serve 480 months as to counts 1 and 3 to run concurrently, 240 months as to count 5 to run concurrently, and 120 months total as to counts 2, 4, and 6 to run consecutively, for a total sentence of 600 months' imprisonment. Dickens now appeals his conviction and sentence.

## II.

Dickens raises a variety of claims regarding the prosecutor's conduct, none of which he raised in the district court. When counsel fails to object during trial to a prosecutor's remarks, we review prosecutorial-misconduct claims for plain error. *United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008). Plain error review consists of a four-part analysis: "whether '(1) an error occurred in the district court; (2) the error was obvious or clear; (3) the error affected defendant's substantial rights; and (4) this adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Id.* at 376–77 (quoting *United States v. Emuegbunam*, 267 F.3d 377, 406 (6th Cir. 2001)).

To determine whether prosecutorial misconduct occurred, we first evaluate whether the statements at issue were improper. *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009). We then determine whether such statements were flagrant using four factors: "'(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberate or accidentally made; and (4) whether the evidence against the defendant was strong.'" *Id.* (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). Under plain-error review, the statements must be "sufficiently flagrant to warrant reversal of the defendant's conviction despite his failure to object to them at trial." *United States v. Modena*, 302 F.3d 626, 634 (6th Cir. 2002).

### A.

Dickens first argues that (1) "[t]he prosecutor repeatedly and improperly asked Dickens if other witnesses were lying" and (2) "asked officers if Dickens was lying."

### 1.

In his brief on appeal, Dickens cites four occasions on which the prosecution asked him at trial if someone else was lying, and Dickens argues that it is improper to ask a criminal defendant about the credibility of government witnesses. Dickens specifically found fault with the following questions asked by the prosecution: first, whether an officer's testimony about Dickens's prior statement was a lie; second, whether the former girlfriend of both McClellan and Roush had lied; third, whether witnesses lied about whether Dickens sold them drugs; and fourth, whether all the other witnesses at trial were lying.

In evaluating a claim of prosecutorial misconduct, we first determine whether the prosecution's conduct was improper. *See Carson*, 560 F.3d at 574. Indeed, sister circuits have held that "questions posed to a criminal defendant about the credibility of government witnesses . . . are improper." *United States v. Harris*, 471 F.3d 507, 511 (3d Cir. 2006) (citing *United States v. Thomas*, 453 F.3d 838, 846 (7th Cir. 2006); *United States v. Williams*, 343 F.3d 423, 438 (5th Cir. 2003); *United States v. Sanchez*, 176 F.3d 1214, 1219–20 (9th Cir. 1999); *United States v. Sullivan*, 85 F.3d 743, 749 (1st Cir. 1996); *United States v. Boyd*, 54 F.3d 868, 871 (D.C. Cir. 1995); *United States v. Richter*, 826 F.2d 206, 208 (2d Cir. 1987)); *see also United States v. Schmitz*, 634 F.3d 1247, 1268 (11th Cir. 2011). In the earliest of these cases, the Second Circuit took issue with prosecutors who had "been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents must be lying." *Richter*, 826 F.2d at 209. *Richter* held that the prosecutor's "series of questions to [get a defendant] to testify that [a law enforcement officer] was either mistaken or lying" was "improper cross-examination" because "[d]eterminations of credibility are for the jury, not for witnesses." *Id.* at 208 (internal citations omitted); *see also Harris*, 471 F.3d at 511 ("[S]uch questions force defendants to assess the credibility of others who have testified at trial—a function exclusively reserved to the jury."). Thus, the court held, "[p]rosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper." *Richter*, 826 F.2d at 208.

Our circuit has not directly addressed the propriety of asking a defendant whether other witnesses are lying. Although there may be exceptions,[2] the general principle that credibility determinations are meant for the jury, not witnesses, applies here, and the prosecutor's questions were improper.

We must next determine whether the questioning was "flagrant and thus warrant[s] reversal," meaning the questioning (1) tended to mislead the jury or prejudice the defendant; (2) it was extensive; (3) it was deliberate, and (4) the evidence against the defendant was not otherwise strong. *Carson*, 560 F.3d at 574. Not all of the cases that have recognized the impropriety of asking a defendant whether other witnesses are lying have similarly concluded that reversal on that basis was warranted. For instance, although the Third Circuit in *Harris* found that the prosecution's questioning was improper, the court found that such questioning alone does not constitute reversible error and that "courts of appeals generally have not reversed a conviction solely because such questions were posed unless opposing counsel specifically objected to them." *Harris*, 471 F.3d at 511. Thus, although the court in *Harris* found error, it found that error was not plain because "the

---

[2]The government correctly counters that although many circuits have found this sort of questioning improper, it is not always improper. The court in *Harris* recognized that it is necessary for the prosecution to "'be permitted proper and effective cross-examination in an attempt to elicit the truth.'" 471 F.3d at 512 (quoting *United State v. Havens*, 446 U.S. 620, 626–27 (1980)). Instances in which such questions could be proper include when "a defendant opened the door by testifying on direct that another witness was lying." *Id.* (citing *Boyd*, 54 F.3d at 871). Nevertheless, the government's examples that Dickens "opened the door" merely indicate that Dickens's testimony was contrary to the testimony of others, not that Dickens testified that others were lying. The determination of who was most credible is still that of the jury; Dickens did not open the door, and such questioning remains improper.

District Court's error was not clear under the law as it existed during [the defendant's] trial." *Id.* at 512.

In contrast, in *Richter*, the Second Circuit found that the claims of prosecutorial misconduct constituted error that entitled the defendant to a new trial. 826 F.2d at 210. These claims, however, were buttressed by a strong record of misconduct. The court noted that "[b]ecause the prosecutor . . . gave the defendant an alternative of branding [an officer's] testimony as either a lie or mistake and because no objection was taken by defense counsel," it "might be inclined to overlook the impropriety if that were the defendant's sole claim of error." *Id.* at 208. In addition to asking for this "branding" of testimony, the prosecution had also called a rebuttal witness to corroborate the other officer's testimony and focused its summation on the discrepancies in testimony, arguing that "'if [the jurors] find that the FBI agents are telling the truth, then [the defendant] is guilty." *Id.* at 208–09 (first alteration in original). Thus, the conduct at issue in *Richter* was especially egregious.

Two unpublished opinions have discussed whether the proposition first raised by the Second Circuit in *Richter*—that "[p]rosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper"—should apply in our circuit. *See Richter*, 826 F.2d at 208. Both decisions declined to reach the precise issue but offer language suggesting that such questioning would rarely constitute plain error. *See United States v. Washington*, 60 F.3d 829, 1995 WL 408128 (6th Cir. 1995) (table); *United States v. Bustos*, 16 F.3d 1221, 1994 WL 47785 (6th Cir. 1994) (table); *see also United States v. Todd*, No. 08-5449, 2011

WL 2474281, at *3 (6th Cir. June 22, 2011) (concluding that cross-examination of the defendant in which the prosecution asked "whether other witnesses were lying after his testimony contradicted theirs" did not constitute plain error). The court in *Washington* noted that "such questioning can, in some circumstances, amount to plain error" but suggested that the holding in *Richter* was based on extreme circumstances. *Washington*, 1995 WL 408128, at *3. Additionally, in *Bustos*, we noted that similarly questionable cross-examination failed to amount to plain error. *Bustos*, 1994 WL 47785, at *5. The defendant asserted that "compelling [a co-defendant] to label each material witness . . . 'mistaken'" forced the co-defendant "to characterize another witness' testimony as mistaken in order to maintain her innocence and . . . usurped the function of the jury as the sole judge of witness credibility." *Id.* The court articulated that, viewed in light of the entire record, this conduct failed to taint the record as the co-defendant had "contradicted virtually all of the testimony of the government's witnesses" and "willingly characterized the testimony of government witnesses as 'wrong.'" *Id.* The court then insinuated that *Richter* should be limited because "the [Second Circuit] stated that it would have been inclined to overlook this conduct were it the sole claim of error." *Id.*

The error in questioning Dickens about whether other witnesses were lying is hardly flagrant enough to amount to plain error. Although the questions were asked deliberately, the four instances of improper questioning neither mislead the jury nor prejudiced Dickens. The questions were not "extensive," and the evidence against Dickens was strong. *See Carson*, 560 F.3d at 574. Moreover, given that our circuit has not previously held that such questioning is in fact improper, under a plain

error analysis such error could not be considered "obvious or clear." *See Henry*, 545 F.3d 376–77.

We, therefore, find that these improprieties do not amount to plain error.

2.

Dickens also complains about the prosecution's questioning of officers regarding Dickens's

pre-trial interviews during the investigation of the case.[3] First, the prosecution asked an officer about

Dickens's "series of lies," which revealed that Dickens's story changed when confronted with

evidence of phone records.[4] Second, the prosecution asked another officer whether Dickens had told

the truth and thus was permitted to testify before the grand jury, to which the officer replied no.[5]

---

[3] Dickens mischaracterizes these interactions as "[t]he prosecutor [asking] Officers Zerkla and Horan to characterize Dickens' *testimony*" (emphasis added), when the prosecution actually asked the officers about Dickens's veracity in the course of their investigation, not about Dickens's testimony at trial.

[4]
Q.   Has at that point Mr. Dickens ever been confronted with that evidence, either his phone records or Mr. Haynie's records?
A.   No, sir.
Q.   So when Mr. Dickens comes in on July 23, do you ask him when is the last time he talked to Mr. McClellan?
A.   Yes.
Q.   All right. And initially what does he tell you?
A.   Three to four days prior to the murder of Mr. Roush.
. . .
Q.   When you are interviewing him, does he tell you a series of lies?
A.   Yes, sir.
Q.   Was that the first one?
A.   That was the first one.

[5]
Q.   What was the purpose of talking to [Dickens] on [December 16, 2008]?
A.   At that time, we had served him with a grand jury subpoena.

The cases cited by Dickens dealing with prosecutors who asked government witnesses about the truthfulness of a defendant's *testimony* are uninstructive, as the prosecution here did not question the officers on the veracity of Dickens's testimony. *See United States v. Sullivan*, 85 F.3d 743, 750 (1st Cir. 1996) ("[C]ounsel should not ask one witness to comment on the veracity of the testimony of another witness."); *United States v. Nichol*, 134 F. App'x 135, 138 (9th Cir. 2005) (finding that the "prosecutor erred in asking [an officer] about the weight he would give the consistent testimony of multiple witnesses," but nonetheless concluding that this error was harmless). Nevertheless, the principle that opinions about credibility are for the jury is equally applicable in this context. *See United States v. Sanchez-Lima*, 161 F.3d 545, 548 (9th Cir. 1998) (holding that "opinion evidence regarding a witness' credibility is inadmissible" and that the error in admitting this testimony was not harmless because the "jury's verdict necessarily depended on the credibility of the bolstered witness").

The government argues that this line of questioning was not improper by characterizing these two instances as the sort of "bolstering" permitted under *United States v. Martinez*, 253 F.3d 251, 254 (6th Cir. 2001), and *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999). Bolstering,

---

We took him from Orient and we brought him here to the federal courthouse. And the purpose was to have him testify before the federal grand jury and relay to them the story or stories that he has told referencing this investigation.

Q.     If he was going to tell the truth, what was going to happen?
A.     We were going to put him before the grand jury and let the grand jury hear his story.
Q.     Did he tell the truth?
A.     He did not.

which "occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury," *Martinez*, 253 F.3d at 254 (quoting *Francis*, 170 F.3d at 551), is generally improper. Still, "the prosecutor 'may ask a government agent or other witnesses whether he was able to corroborate what he learned in the course of a criminal investigation.'" *Id.* (quoting *Francis*, 170 F.3d at 551). The prosecutor "'must also draw out testimony explaining *how* the information was corroborated and where it originated.'" *Id.* (quoting *Francis*, 170 F.3d at 551).

Although the questioned testimony hardly fits within the category of *Martinez* "bolstering" as urged by the government, in any event the testimony was highly unlikely to affect Dickens's substantial rights or prejudice him in any way. *See Henry*, 545 F.3d at 376–77; *Carson*, 560 F.3d at 574. Significantly, Dickens himself admitted to lying to these officers during the course of the investigation. He stated that he lied about his time and history with McClellan, the last time he saw McClellan, and the last time he talked to McClellan on the phone. Dickens admitted that his story changed regarding the source of the gun used to kill Roush, how McClellan got the gun, and when Dickens found out about Roush's death. Dickens also admitted that he lied about not knowing Haynie. Dickens testified that his motivation for the lying was that he was frightened.

Regardless of whether this line of questioning was improper, we conclude that it did not prejudice Dickens in any way and thus fails to constitute plain error.

B.

Dickens also argues that the prosecution's closing arguments were "improperly overzealous." Specifically, he contends that the prosecutor improperly (1) made statements about witness credibility during his closing and (2) called Dickens a liar and a "dope fiend." "[T]he adversary system permits the prosecutor to prosecute with earnestness and vigor." *United States v. Young*, 470 U.S. 1, 7 (1985) (internal quotation marks omitted). But "[p]rosecutors sometimes breach their duty to refrain from overzealous conduct by . . . offering unsolicited personal views on the evidence." *Id.* "Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.* at 11. "To be certain, prosecutors can argue the record, highlight the inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence. But, they can not put forth their opinions as to credibility of a witness . . . ." *Bates v. Bell*, 402 F.3d 635, 646 (6th Cir. 2005).

First, Dickens challenges the prosecutor's comments regarding the credibility of two witnesses, Haynie and Tangy Laudermilt (an ex-girlfriend of McClellan and Roush). Dickens cites a moment during the prosecution's closing, in which the prosecutor stated that "Haynie told the

truth."[6] Dickens also cites the prosecution's argument that if Laudermilt would admit that she

bought Oxycontin illegally that morning, "why would she make up stuff about Lacy [Dickens]?"

Dickens argues that these statements constitute improper vouching. "Improper vouching

occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the

witness's credibility thereby placing the prestige of the office of the United States Attorney behind

that witness." *Francis*, 170 F.3d at 550. "It is patently improper for a prosecutor either to comment

on the credibility of a witness or to express a personal belief that a particular witness is lying."

*Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005).

Initially, we note that the statements were made in the context of a broad assessment of the

evidence in the record. The thrust of the argument about Haynie was that, while Dickens changed

his story many times, Haynie's testimony never changed despite the phone records and other

witnesses' testimony that later became available. Additionally, the comment about Laudermilt was

made against the background of other record evidence. The prosecution suggested that it was

unlikely that she would lie given her willingness to inculpate herself in other ways.

---

[6]     But what if Haynie had lied? . . . What if he was making it all up? . . .
[Haynie's statements] could have caused Haynie problems. But
Haynie told the truth. What if Haynie lied about where the gun came
from? What if it was someone who had no access to guns? No, that
didn't happen either. . . . It all fit. Think about his testimony. Think
how it fits, how it's supported, how it's corroborated. If Haynie
wasn't going to tell the truth, that would have been a problem. . . .
He's not the one that kept changing his story, who, when confronted
by the evidence, changed his story. . . . The evidence corroborates
what [] Haynie told you . . . .

Even if these statements amounted to improper vouching, "[a]n improper statement of personal belief, however, is not per se reversible error. [We] must find that the improper statement was flagrant enough to warrant reversal." *Henry*, 545 F.3d at 380 (internal quotation marks and citation omitted). Two separate harms arise from such misconduct: first, such comments convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges; and second, the prosecutor's opinion as to the veracity of certain witnesses carries the imprimatur of the government. *Hodge*, 426 F.3d at 378 (citing *Young*, 470 U.S. at 18–19). While the second harm might be an issue in this case, the first harm is not a concern as the statements were precisely a reflection of evidence presented to the jury. We find that these statement were neither clearly improper nor did they present harms sufficiently flagrant to warrant reversal because the prosecution adequately placed its comments within the context of evidence adduced at trial.

Second, Dickens challenges the propriety of the prosecution's discussion of Dickens's truthfulness:

> Witness testimony is direct evidence. If you believe that witness, that is direct evidence. I would also submit to you, if you don't believe that witness, you can draw a conclusion from that as well. . . . You either believe Lacy Dickens, or he's a liar. I'll use the word [liar]; you evaluate his credibility and determine it. You decide if all the lies that he admitted telling previously, if that helps you draw some conclusions from then the testimony he's given here the last two days. . . . And if someone is going to lie about those important pieces of a murder investigation, you can draw conclusions from that. . . . But we're not asking you to just use that. We're asking you to use all the evidence that you have.

The credibility of Dickens was a key issue in the case, and Dickens admitted to changing his story multiple times prior to trial. Furthermore, we have held that it could be proper "for the

-17-

prosecutor to argue that the jury should infer that Defendant . . . was not credible, and should not be believed." *United States v. Stover*, 474 F.3d 904, 916 (6th Cir. 2007). "The prosecution may imply that a defendant is lying during its closing argument so long as the prosecutor emphasizes the discrepancies between the defendant's testimony and the record." *Id.* The prosecution never exactly stated that Dickens was lying at trial but very clearly emphasized the previous lies told by Dickens as well as the discrepancies between Dickens's testimony and that of other witnesses at his trial. These statements are likely proper and were hardly sufficiently flagrant to warrant reversal because they are merely a reflection of what was already a prominent issue in the trial record.

Finally, Dickens argues that the prosecution's statement that he is "a dope fiend" was improper. One isolated incident of inflammatory language, however, will not meet the high burden required to warrant reversal under plain error review due to prosecutorial misconduct. *See Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009) ("Calling [the defendant] a 'demon' comes closer to the line—it was unnecessary and unprofessional—but it goes no further than similar comments that have not required setting aside a state conviction."); *cf. United States v. Hands*, 184 F.3d 1322, 1333 (11th Cir. 1999) (finding that prosecutor's words—"[t]en of the fourteen pages of the closing statement transcript contain multiple repetitions of the words 'monster,' 'vicious,' 'wicked,' and 'maniac'"—"were improper because they were 'calculated to inflame [the] jury'").

We, therefore, conclude that the prosecution's comments during closing argument regarding the veracity of various witnesses, including Dickens, as well as the prosecution's reference to

Dickens as a "dope fiend," are not sufficient to warrant reversal under a claim of prosecutorial misconduct.

## II.

Dickens next argues that the cumulative effect of trial errors renders his trial fundamentally unfair and requires reversal of his convictions. "In order to obtain a new trial based upon cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004).[7] "'[E]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair.'" *Id.* (quoting *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2007)).

Dickens claims that his trial came down to a "credibility contest," and for that reason the prosecution's questioning and comments dealing with witness credibility were especially prejudicial. Viewed another way, however, the prosecutor's comments were of little significance, given the nature of the credibility issues before the jury. Dickens had lied a number of times prior to trial, and there was no requirement that inconsistencies in his story be excluded. Furthermore, Dickens's testimony greatly differed from that of other witnesses at his trial; thus, those discrepancies were

---

[7] "This Court has not directly addressed the issue of how (if at all) to incorporate into a cumulative-error analysis, plain errors that do not, standing alone, necessitate reversal. Some circuits combine all nonreversible errors . . . . In contrast, other circuits appear to review separately any cumulative plain errors." *United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009). As was the case in *Warman*, this distinction is irrelevant here because the cumulative-error claim fails regardless.

particularly informative and subject to question and comment by the prosecution. Although the

prosecution should avoid directly asking witnesses if others were lying and using phrases such as

"Haynie told the truth," these statements were isolated and the desired inferences were buttressed

by the evidence that had been presented. The cumulation of the above-mentioned "misconduct" fails

to render Dickens's trial fundamentally unfair. *See Trujilo*, 376 F.3d at 614.

III.

Finally, Dickens makes a general assertion that the district court's 600-month sentence was

procedurally and substantively unreasonable because he was punished more severely than his co-

defendants. Generally, we review the district court's sentencing determination for abuse of

discretion. *United States v. Bolds*, 511 F.3d 568, 578 (6th Cir. 2007). This "reasonableness"

analysis has two components: first, whether the decision is procedurally reasonable and, second,

whether it was substantively reasonable. *Id.*

A.

In this case, the district court properly asked Dickens whether "there [was] any legal

objection to the sentencing guideline computation or any other legal issue that [had] not previously

been raised that [Dickens would] like to raise," to which Dickens's counsel responded, "No, your

honor." When a defendant fails to object after the sentence has been pronounced, any procedural

challenge to the sentence is to be reviewed for plain error. *United States v. Vonner*, 516 F.3d 382,

386 (6th Cir. 2008) (*en banc*). Thus, for any procedural challenge, Dickens must show "(1) error,

(2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the

fairness, integrity or public reputation of the judicial proceedings." *Id.* (internal quotation marks omitted).

In reviewing the procedural reasonableness of a sentence, we must "'ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" *United States v. Martinez*, 588 F.3d 301, 324 (6th Cir. 2009) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).

By implicating 18 U.S.C. § 3553(a)(6)—which states that in imposing a sentence, a district court shall consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct"—Dickens challenges whether the district court considered the § 3553(a) factors and adequately explained his sentence for meaningful appellate review. During the sentencing hearing, Dickens argued that he played a less significant role than McClellan and Haynie, but the government disagreed in light of Dickens's higher criminal history category and his failure to attempt to prevent what ultimately occurred.

After the parties made their arguments and others were given an opportunity to speak, the district court explicitly considered a number of the § 3553(a) factors, including the desire to avoid unwarranted sentencing disparities. The district court specifically took note of Haynie's and McClellan's sentences. The court then considered Dickens's Guidelines range, a minimum of 360 months up to a maximum of life in prison. The district court then compared that to McClellan's

Guidelines range and sentence; because McClellan had a criminal history category of 1, his range was 265 to 269 months' imprisonment, and the court sentenced him at the top of that range. Additionally, the court recognized that, unlike McClellan and Haynie, Dickens told many different stories and thus obstructed justice.

After mentioning each of these things, the court wrestled with the question of "how much more culpable [Dickens was] than [] McClellan and [] Haynie." Earlier in the sentencing hearing, when calculating Dickens's Guidelines range, the district court decided to lower the base offense level from 43 to 38 because "these facts are closer to second degree murder than they are to a first degree murder." As part of its rationale for this decision, the district court stated that "[t]here's no evidence that [] Dickens directed the actions of McClellan or Haynie. He did participate in the planning of the instant offense, however, but there's no indication that he was the mastermind." In contrast, when ultimately determining Dickens's culpability in comparison with McClellan and Haynie, the district court reasoned that Dickens was "too involved in the planning, too involved in the cover up" to qualify for the minimum sentence of 30 years' imprisonment. After pronouncing Dickens's sentence, the district court clearly articulated Dickens's culpability with respect to McClellan and Haynie:

> The Court believes that [Dickens is] more responsible than the animal that took the gun and cracked [Roush] across the head with it discharging a bullet into the back of his head and killing him. [Dickens] helped plan it. . . . [Dickens is] not solely responsible; McClellan is responsible, too. But [Dickens is] far more responsible. [Dickens] had it within [his] ability to call it off. [Dickens] selected the victim or helped McClellan select the victim.

Accordingly, the Court's explanation for choosing between the minimum guideline range and the maximum is based upon my belief that [Dickens is] more culpable than the other two . . . .

Thus, the court explicitly considered the need to avoid unwarranted sentencing disparities with respect to Dickens's co-defendants and very clearly explained the chosen sentence to allow for meaningful appellate review. Dickens argues that the district court contradicted itself by stating that there was no indication that Dickens was the "mastermind," and later that Dickens was "more culpable than the other two," but these statements do not necessarily contradict. Someone can be both more culpable and not the mastermind, and the district court explained that Dickens was more culpable because he could have called off the crime but failed to do so and also participated in selecting Roush. Thus, we affirm Dickens's sentence as procedurally reasonable.

B.

Even though Dickens did not object to his sentence, the substantive reasonableness of his sentence will be reviewed for an abuse of discretion. Within-Guidelines sentences are afforded a rebuttable presumption of reasonableness. *Bolds*, 511 F.3d at 581. "The district court 'must consider all of the relevant § 3553(a) factors and impose a sentence that is sufficient but not greater than necessary to comply with the purposes of § 3553(a)(2).'" *United States v. Webb*, 616 F.3d 605, 610 (6th Cir. 2010) (quoting *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008)). "'A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors,

or gives an unreasonable amount of weight to any pertinent factor.'" *Id.* (quoting *Conatser*, 514 F.3d at 520).

This court has reviewed arguments that a sentence resulted in an unwarranted sentencing disparity under the umbrella of a substantive reasonableness challenge. *See Carson*, 560 F.3d at 586 (classifying as a substantive reasonableness challenge the contention that defendant's "sentence resulted in an unwarranted sentencing disparity and the district court failed to give appropriate weight to this disparity"). This factor, however, "'concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants.'" *Id.* (quoting *Conatser*, 514 F.3d at 521). "[A] number of factors might result in legitimate co-defendant disparities, including 'differences in criminal histories, the offenses of conviction, or one coconspirator's decision to plead guilty and cooperate with the government.'" *Id.* (quoting *Conatser*, 514 F.3d at 522). In this case, the district court considered that Dickens had a criminal history category of 6, while McClellan's was only 1; that Haynie pled guilty, while Dickens proceeded to trial; and that Dickens's lied throughout the investigation and viewed this as "obstruction of justice." Dickens's sentence is not substantively unreasonable.

## IV.

For the foregoing reasons, we affirm Dickens's conviction and sentence.